NORTH AMERICAN ACCIDENT INS. CO. v. MILLER.   (No. 1124.)

(Court of Civil Appeals of Texas. Amarillo. March 7, 1917. Rehearing Denied March 28, 1917.)

1. INSURANCE ⬤⟹528—ACCIDENT INSURANCE —TOTAL DISABILITY—ATTEMPT TO WORK.

Where a well-drilling superintendent was injured by a blow on the chest, which rendered him unconscious and compelled him to remain in bed for a day or two, and which shortly thereafter caused an aortic aneurism, which resulted in his death a year and one-half thereafter, though in the meantime insured attempted to perform his duties, but was unable to do so except at intervals, and then only for a short period of time after which he would be compelled to lie down and rest, and there was expert testimony that any exertion by him was apt to rupture the aneurism and would shorten his life, he was immediately and continually disabled from performing every duty pertaining to his occupation within an accident insurance policy; since absolute physical and mental disability is not required, and the fact that insured returned to his work at long intervals and worked for only short periods does not break the continuity of the disability.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1314.]

2. INSURANCE ⬤⟹665(5) — ACCIDENT INSURANCE—EVIDENCE—CAUSE OF DEATH.

In an action on an accident insurance policy, evidence held to show that the cause of insured's death was an aneurism, caused by an accidental blow, not arterio sclerosis superinduced by disease.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1719, 1721, 1722.]

3. INSURANCE ⬤⟹646(9)—ACTION ON POLICY— PRESUMPTION—NOTICE OF LOSS.

Where the petition for recovery, under an accident insurance policy, alleged compliance with all the terms of the policy, and pleaded notice and proof of death and disability, and defendant did not plead want of notice under oath, as required by Rev. St. 1895, art. 3379, or show by evidence that notice had not been given, it will be presumed that notice was given.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1666.]

4. INSURANCE ⬤⟹603—LIABILITY ON POLICY —SETTLEMENT—FRAUD.

Where the beneficiary, under an accident insurance policy, secured the assistance of the agent who wrote the policy, and who was a friend of the family, in collecting the policy, and also employed an attorney to represent her, in case of litigation, and, after the attorney refused an offer of settlement, the agent, without

the attorney's knowledge and acting on behalf of the company, induced the beneficiary to accept a settlement of the amount refused by her attorney by informing her that the company was not liable in any amount, under the policy, which representation she believed because of the confidence she imposed in the agent, the settlement was procured by fraud, and does not bar recovery of the amount due under the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1499.]

**5. APPEAL AND ERROR ☞1001(1) — REVIEW —VERDICT—FRAUD.**

The verdict of the jury finding that a settlement of a claim, under an accident insurance policy was procured by fraud, will not be disturbed, where the evidence discloses suspicious circumstances of the character to induce belief that artifice has been practiced or that confidence has been abused.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3928-3933.]

**6. INSURANCE ☞603—LIABILITY ON POLICY —FRAUDULENT SETTLEMENT—RATIFICATION.**

Where the beneficiary, under an accident insurance policy, who had been induced by fraud to settle her claim, without the knowledge of her attorney, was thereafter induced to dismiss the action filed by the attorney by representation that the settlement was a bar to any relief in that action, and that she would be taxed with the costs, and she was not informed that the settlement could be set aside because of fraud, she did not ratify the settlement; since such ratification, to be effectual, presupposes full knowledge of her rights by the party ratifying.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1499.]

**7. INSURANCE ☞603 — ACTION ON POLICY — FRAUDULENT SETTLEMENT — TENDER OF AMOUNT RECEIVED.**

Where the beneficiary of an insurance policy had been induced by fraud to accept a settlement on the policy, and was unable to return the amount received, she may recover on the policy without tendering a return of the amount received for the settlement; credit for that amount being given on any recovery on the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1499.]

**8. INSURANCE ☞524—ACCIDENT INSURANCE —"TOTAL DISABILITY"—"PREVENT."**

The phrase "total disability," that prevented insured from performing any and every kind of duty pertaining to his occupation, means such disability as would prevent him from performing substantially, or to some material extent, every part of the business pertaining to his occupation, or such disability that would require him to desist from the transaction of his business, in the exercise of ordinary care in the preservation of his life and health; since the word "prevent" is synonymous with "hinder."

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1310.

For other definitions, see Words and Phrases, First and Second Series, Prevent; Total Disability.]

**9. TRIAL ☞260(1) — REQUESTED CHARGE — REPETITION OF GIVEN CHARGE.**

The refusal of a specific charge is not error, where the issues submitted and the charge given in connection therewith were sufficient to present the issues, so as not to be misunderstood by the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 651.]

**10. TRIAL ☞251(6)—REQUESTED CHARGE — APPLICABILITY TO ISSUES.**

In an action on an accident insurance policy, a requested charge as to partial disability

was properly refused, where the only issue raised by the pleadings was as to total disability.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 591.]

**11. TRIAL ☞352(1)—SUBMISSION OF ISSUES— CAUSE OF DEATH.**

In an action by the beneficiary of an accident insurance policy, a special issue as to whether the death of insured was occasioned by the accident directly, independently and exclusively of all other causes, in connection with which the court charged that, if the jury found that he died of arterio sclerosis primarily caused by disease, they should answer the issue in the negative, sufficiently submitted the issue of the cause of death.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 840.]

**12. APPEAL AND ERROR ☞1067—REQUESTED CHARGE — REPETITION OF GIVEN CHARGE — POSITION OF CHARGE GIVEN.**

A contention that the court should have given a requested charge, because its charge covering the question was given in connection with a special issue in obscure portion of the charge, does not require reversal, where the charge was read and submitted to the jury and no injury could have resulted by the position it occupied.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4229; Trial, Cent. Dig. § 475.]

**13. EVIDENCE ☞318(7)—CAUSE OF DEATH— CERTIFICATE.**

In an action by the beneficiary of an accident insurance policy, the certificate of the cause of death given by the attending physician is an ex parte declaration not admissible in evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1199.]

**14. APPEAL AND ERROR ☞1058(2) — HARMLESS ERROR — EXCLUSION OF EVIDENCE — FACT OTHERWISE ESTABLISHED.**

Error, if any, in excluding from evidence the certificate of the attending physician showing the cause of death, is not prejudicial, where the physician testified fully as to the cause as stated in his certificate.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4195, 4201.]

**15. INSURANCE ☞675—LIABILITY ON POLICY —ATTORNEY'S FEES.**

Where the beneficiary under an accident insurance policy made demand for the amount due, which was refused, and thereafter made a settlement which was set aside for fraud, the court in an action on the policy can allow the beneficiary attorney's fees.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1805, 1806.]

**16. TRIAL ☞350(2)—SUBMISSION OF ISSUES— EVIDENTIARY FACTS.**

Special issues which defendant requested to have submitted to the jury were properly refused, where they sought to establish special facts included in the ultimate fact to be found.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828, 832.]

**17. INSURANCE ☞585(1)—ACCIDENT INSURANCE — DISABILITY BENEFITS — RIGHT OF BENEFICIARY.**

Where an accident insurance policy provided that if insured suffered total disability, and if during the period of such total disability he died as the direct result of the bodily injury, the company would pay the beneficiary the principal sum and the weekly indemnity, for the period between the date of the accident and the date of the death, all amounts accruing under the

policy, both before and after death which occurred after a total disability for a year and one-half, are payable to the beneficiary.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1461, 1464, 1468.]

Appeal from District Court, Dallam County; D. B. Hill, Judge.

Action by Abbie L. Miller against the North American Accident Insurance Company. Judgment for the plaintiff, and defendant appeals. Affirmed.

Ben H. Stone, of Amarillo, and J. Y. Powell, of Houston, for appellant. W. A. Davidson, of Amarillo, and R. E. Stalcup, of Dalhart, for appellee.

HUFF, C. J.    Abbie L. Miller sued the North American Accident Insurance Company on an accident policy, issued by that company, insuring her husband against accident, etc., in the principal sum of $5,000, and weekly benefits for $25 per week, alleging substantially that William J. Miller, her husband, was accidently injured on or about the 10th day of October, 1911, and that he was immediately totally disabled, and which disability continued to the time of his death; that such injury was the direct, proximate, and sole cause, exclusive of all other causes, in total, immediate, and continuous disability which continued to his death, which occurred April 11, 1913, Mrs. Miller sought a recovery for the principal sum of $5,000, and weekly indemnity of $25 for 78 weeks, and reasonable attorney's fees. It is alleged the injury received by Miller resulted in aneurism of the aorta, which was incurable and resulted in the death of Miller, on the date above stated; that Mrs. Miller, his wife, was the beneficiary named in the policy; and that the injury was received during the term of the policy.

The defendant answered by general denial and exceptions, and further the settlement of the claim by payment to Mrs. Miller of $1,000, in full compromise, settlement, and discharge of all liability under the policy, specially denied that the injury resulted from the accident as alleged, and that Miller was actively engaged in his occupation as a deep well driller, superintending, the only capacity in which he was insured, and in plumbing work long after the injury; that the insured died of acute dilation of the heart and arterio sclerosis primarily caused by syphilis.

The court submitted special issues to the jury as follows:

Special issue No. 1: "Did the said W. J. Miller, on or about October 10, 1911, while engaged in superintending the work on the drilling of the well in Dallam county, sustain through accidental means a bodily injury in the manner alleged in plaintiff's petition? Answer, 'Yes,' or 'No.'" The jury answered: "Yes."

Special issue No. 2: "If you answer the foregoing special issue in the affirmative, then you will find whether or not such bodily injury so sustained resulted directly, independently, and exclusively of all other causes in immediate, continuous, and total disability that prevented him, the said William J. Miller, from performing any and every kind of duty pertaining to his occupation, continuing until the death of the said William J. Miller. Answer this special issue, 'It did,' or 'It did not.'" The jury answered: "It did."

Special issue No. 2a: "If you have answered special issue No. 1 in the affirmative, then you will find whether or not said accident, directly, independently, and exclusively of all other causes, produced an aneurism of the aorta of the said William J. Miller. Answer this special issue, 'It did,' or, 'It did not.'" The jury answered: "It did."

Special issue No. 3: "If you have answered special issues Nos. 1 and 2a each in the affirmative, then you will find whether or not the death of William J. Miller was caused directly, independently, and exclusively of all other causes by said aneurism of the aorta. Answer this special issue, 'It was,' or, 'It was not.'" The jury answered: "It was."

Special issue No. 4: "You will find whether or not the settlement, in which Mrs. Miller accepted the sum of $1,000 in satisfaction of her claim on the policy and executed the release introduced in evidence, was procured by fraud on the part of the defendant. Answer this special issue, 'It was,' or, 'It was not.'" The jury answered: "It was."

Special issue No. 5: "If your answer to the foregoing issue is in the affirmative, then you will find whether or not the plaintiff thereafter ratified such settlement. Your answer to this special issue will be, 'She did,' or, 'She did not.'" The jury answered: "Did not."

Special issue No. 6: "What amount, if any, do you find from a preponderance of the evidence would be a reasonable attorney's fee for the prosecution and collection of plaintiff's claim on the policy herein, in the event it should be determined by the court, under your previous findings, that she is entitled to recover? You will answer this special issue by stating the amount, if any, found by you." The jury answered: "$500.00."

On this verdict the court rendered judgment, after allowing credit of $1,000, the total sum of $8,323, being the principal sum insured, weekly benefits, interest thereon, and attorney's fees, after allowing the credit. The provisions of the policy material to the consideration of this case are as follows:

"The Insuring Clause.

"Does hereby insure William J. Miller (herein called the insured) well-boring contractor, not handling explosives, superintending only in Class O, in the principal sum of five thousand dollars (herein called the principal sum) and in the sum of twenty-five dollars a week (herein called the weekly indemnity) against (1) bodily injury sustained during the term of this policy, through accidental means (excluding suicide, sane or insane, or any attempt thereat, sane or insane) and resulting directly, independently and exclusively of all other causes, in

"(a) Immediate, continuous and total disability that prevents the insured from performing any and every kind of duty pertaining to his occupation. * * *

"(c) Death, as follows:

"Accident Indemnities. * * *

"Death.

"Article 3. If the insured suffers total disability, and if, during the period of said total disability, the insured suffers death as the direct result of the bodily injury, causing the said total disability; or, if within ninety days from the date of the accident, irrespective of total disabil-

ity, the insured suffers death; the company will pay the beneficiary.

"The Principal Sum.

"And, for the period between the date of the accident and the date of death, an additional sum of

"The Weekly Indemnity. * * *

"Article 15. In the event of the insured's death prior to the payment of any indemnity to which the insured may have become entitled under this policy, such indemnity shall be paid by the company to the beneficiary. * * *

"Article 16. Written notice of an accident on account of which a claim may be made hereunder must be given to the company at its home office in Chicago, Illinois, as soon as may be reasonably possible, together with full particulars thereof, and the full name and address of the insured. Like notice of bodily injury or death on account of which a claim is to be made must be given to the company in like manner. Affirmative proofs in writing must be filed with the company as follows:

"Section 1. Accident Claims. Affirmative proofs of death, dismemberment, loss of sight, total disability or partial disability, must be filed with the company within two months from the time of death or of dismemberment or of loss of sight or of the termination of the period of total disability or partial disability, for which claim is made. * * *

"Article 24. This policy is issued in consideration of the premium and of the statements which are set forth hereon in the schedule of warranties which are made a part hereof and which the insured makes and warrants to be true by the acceptance hereof, and policy is subject to the conditions and provisions herein contained and indorsed hereon. * * *

"Article 27. If the insured is injured fatally or otherwise in any occupation classed by the company as more hazardous than that stated at the foot of the schedule of warranties, the company's liability shall not exceed such proportion of the principal sum or other indemnity under this policy as the premium paid by him will purchase at the rates fixed by the company for such increased hazard."

Under the schedule of warranties are found the following:

"(g) Whose business is that of plumber, steam fitter and well contractor.

"(h) The duties of my occupation are fully described as follows: Well-boring contractor, not handling explosives, superintending only.

"This policy is dated the 15th day of June, 1911, and expires June 15, 1912, at noon, standard time at the place of the insured's address written above."

The insured's occupation is classed by the company as "C."

The facts warrant the finding: That William J. Miller received an injury while superintending the work in sinking a deep well about the 10th day of October, 1911. That a rope broke, and the machinery was released thereby, which caused the casing to which was attached a wrench to revolve around very rapidly. As the wrench came around, the end of the wrench struck Miller in the upper chest, which knocked him flat on his back, and that the blow was one of great force. This blow immediately rendered him unconscious. That he was picked up and placed in a conveyance and carried home. That the blow rendered the place on his chest struck black and bruised looking. Miller was placed in a bed the day he received

the injury, but on the next morning was able to get out of bed, and again returned to the work; but in the afternoon was again brought home and took his bed, where he remained for something like two weeks, unable to leave the house. During these two weeks, at the point where this bruise was on his chest there developed what his wife termed a small "bunch"—perhaps an inch and half in diameter. That he complained of severe aching across the breast, and this place could be seen to pulse as the heart would beat and felt like the pulse. He also developed a cough, which was described as being a very peculiar cough, unlike a cough from an ordinary cold; some of the witnesses describing it as a cough like a cow, a harsh, rasping cough.

The evidence would tend to show that nothing of this kind was on Miller's body before this injury; that this protrusion or bunch continued to grow and had the pulsation first described up until his death, and continued painful, his wife describing the place at the time of his death as something like four inches in diameter and protruding an inch and a half or two inches, and protruded so much that it would hold his shirt out so that you could notice it after he was dressed. His wife, describing his condition, said it did not seem that he was able to go, and that she advised him to stay at home and keep quiet, but he was determined to go. He was always after that short of breath. During the time that he was sick in bed at home, she noticed that, when a man would come to the house to have a consultation in regard to the business, he would be excited and nervous while they were there and exhausted when they were gone. Just thinking about it would have such an effect on him that it would exhaust him and affect his breathing, and the cough would start, and when he went to bed had to be propped up with pillows, and it would then take quite a while for him to get comfortable, and sometimes he could not sleep at all, and would be compelled to get out of bed and read, and that he would ache so much across the chest and be in such distress that he could not lie down. He did not seem to get any rest after the aneurism developed, and was always suffering from it. Previous to that time he carried himself straight and walked fast, afterwards was always bent over, and could not walk as he did before. He never did straighten up after the development of the "bunch," as his wife terms it. His wife stated that they went to Phœnix, Ariz., to get into a lower altitude, where Mr. Miller died in April, 1913; that there was no change for the better during any part of the time they were there; and that he grew weaker all the time and still had the cough always during that time. He was worse at times than others. The spells would come on him in the night, and perhaps he would be in bed an hour and get to sleep and wake up, but could not breathe, and

he would have to get up and fight for life perhaps an hour. It would seem that he could not possibly get his breath, and would be exhausted when he would come out from one of the spells.

A number of witnesses testified to their observation and acquaintance of Mr. Miller, before and after the injury. He was described as being an able-bodied, vigorous, and energetic man previous to this time, but after the injury they observed that he was unable to do work for any length of time. The evidence shows that he employed a liveryman to carry him out to the well, which he was superintending, and that he could not remain at the well in the discharge of his duties but a short time, when he would be required to go to what they termed a bunkhouse and lay down; that fits of coughing described by his wife would come on, and he would be exhausted and weak and have to be taken home. Some of the witnesses described his attempt to walk; that he could only go a short distance without being compelled to sit down and rest. The evidence shows that he was a very energetic, determined man, with strong will and purpose to do things and to work, and that he evidently forced himself to attempt work when it was dangerous for him to do so. He gave up reluctantly and fought his disability with determination.

Dr. Dawson, who attended Miller, testified as follows:

"I knew William J. Miller, and first became acquainted with him in 1908 or 1909. His physical condition at that time seemed to be normal. I attended him in some sickness and examined him as to his physical condition later, in 1912. It was probably February, 1912, when I examined him. He was at his home at that time, confined to his bed. I examined Mr. Miller's pulse, temperature, and by inspection, I examined him at that time, removed a portion of his clothing and examined him. At that time I found that he had an aneurism of the arch of the aorta, just under the chin and just above the breastbone. The aorta is a large artery leading to the heart, or from the heart, coming out from the heart and making a curve around underneath the breastbone. The aneurism is a dilatation of the aorta, or enlargement of the artery. There are three kinds of aneurism. In one kind, the dilatation is uniform all around; the second kind will come in pockets; and the third kind is on one side. The dilatation is due to a weakening of the coats of the artery. There are three coats to the artery, and the aneurism is usually caused by the dilatation of the inner or middle coat. There are two general classifications of aneurism, and those due to injury are called traumatic aneurisms, and they dilate on one side only—it isn't a uniform dilatation. That we call traumatic aneurism. The aorta is possibly as large as your finger. This dilatation or aneurism commences and gets large, and sometimes it is large as the fist, or larger. It is just a growing formation or bulge which progresses. In this aneurism you can feel the pulsation of the heart as it beats, and you get the murmur as the blood rushes through that artery. When I say that aneurism results from trauma, I mean by that some external violence or injury. A blow above the aorta will cause this. If the concussion from the blow will rupture the inner or middle coat of the artery, then it will begin to dilate, because there will be a weak place in the wall of the artery.

"My diagnosis of Mr. Miller's case was that he had a traumatic aneurism, which was sacculated or dilated on one side. It was quite large when I saw it, and had a very distinct murmur, and you could see the bulge above the breastbone and feel the movement. There is no rational treatment for aneurism of the aorta, and they go along sometimes for months, and years, until finally the artery will rupture in that weakened place. It may continue to dilate, and in a fit of coughing it will rupture, and, if large, death will immediately result. If it is just a small rupture, the leaking will be slow. Then there may be a blood clot form in this sac where it is dilated, and through which the channel of the artery runs, and a little blood stagnates in this artery, and a portion of it will be picked up and carried into the heart, or some other part of the body, and destroy his life very quickly. There is nothing known in medical science to do for an aneurism of the aorta. It has a few times been attempted to open them up and wrap the artery with wire, but the operation is not a success, and there is nothing to do except to remain still and quiet, and bide the time until it destroys life. No one can state definitely how long a time they have, because it depends on the size of the aneurism and the portion of the body that is affected, and which artery is affected. Mr. Miller's condition was incurable when I first saw him, as I thought, and I so stated to him. A person in this condition, in order to prolong life, should avoid all excitement and violent exertion, and should remain as still and quiet as he can be. He should do nothing to raise the blood pressure. He is not capable of attending to business; that is, it isn't safe for him—any kind of work, or exertion and excitement. Any exertion would cause him to have violent fits of coughing. When they have an aneurism of the aorta, they have a characteristic cough that we call a cow cough; they cough like a cow. You hear them in the dark, and when you have once heard it you will always know when any one has a cough from aneurism. From going up and down steps he would have violent fits of coughing, and increased blood pressure, which would make it dangerous of rupturing the artery. The cough is caused by the pressure of the artery against the nerve. Mr. Miller had that characteristic cough, and when one would hear him once he would always know that was Miller by the cough.

"In my opinion, attention to business or exertion of any kind would tend to shorten Mr. Miller's life in the condition in which I found him. I saw Mr. Miller at intervals along after this time that I saw him at his home and had occasion to know his condition. From that time forward his health failed rapidly, and this aneurism grew gradually larger. I would think it was in 1914 that I saw him last, but I am not positive as to the date; it was a short time before he left this country. I examined him quite frequently, and in the course of my examination I saw nothing about Mr. Miller that would indicate that he had ever had syphilis, or was suffering from syphilis. This aneurism that Mr. Miller was suffering from was a sacculated aneurism, or dilatation of the artery on one side. If it had been idiopathic, or due to some constitutional disease, the artery would have been uniformly dilated in one or more places. This was on one side of the artery. When I spoke of idiopathic or constitutional disease, I meant some disease inherent in the body, and not the result of an external injury of the artery itself. In my opinion a violent blow in the chest with a seven-foot pipe wrench above the aorta would have a tendency to cause an aneurism of the kind that I found Mr. Miller suffering with. Arterio sclerosis is a hardening of the arteries, and lessening of the elasticity of the arteries. It is like a rubber hose when it becomes rotten; it doesn't dilate or stretch as well. That comes

from internal disease of some sort and is idiopathic. I did not discover any symptoms of arterio sclerosis in Mr. Miller. One is liable to an aneurism if he has arterio sclerosis. An artery is built up of three coats. The fabrics of which an automobile tire is built will give a fair illustration of it. The aneurism occurs like an automobile tire that you have broken some of those fabrics in, and you begin to see a bulge in the tire, which indicates that it is weakened at that place, and you are going to have a blowout. I have driven an automobile, but I cannot tell when I have one of those places how long it will be before that blow-out will occur. There is some analogy between an aneurism and a blow-out in an automobile. If this aneurism had been due to arterio sclerosis, or weakening caused by disease, it would have been liable to have burst sooner than if caused from trauma. The length of time that it took to develop a final break and cause death would have something to do with determining whether or not it was caused from disease or from an external blow that injured only some tissues of the artery. If, as a matter of fact, this aorta didn't break and didn't result in death for more than a year from the time that I saw it, I would say that the tissues that were intact at the time I saw it must have been in fairly good condition or they couldn't have resisted the pressure from the inside.

"I know the cough which Mr. Miller had was not caused by asthma. There is nothing that will produce that particular sort of cough but aortic aneurism. Mr. Miller did not have any appearance of having any syphilis. If he had it, I would think I would have been likely to have discovered it; but I do not know definitely. I attended his children and his wife, and if he had syphilis it would most likely have shown in the members of his family, his children or his wife. I saw no evidence of any thing of the kind in Mrs. Miller. I have been asked a good deal about blood corpuscles, two casts in the urine, and stone in the kidney; none of these things could have anything to do with this aneurism. The condition that I found him in, this would have nothing to do with it.

"The size of the aneurism has to be before you see the pulsating tumor depends on the portion of the aorta that is affected, how far it is from the heart, and whether it is high up on the arch or low down. At the place where Mr. Miller had this aneurism, it would have to be larger than an egg, the whole aneurism, before it would show. When an aneurism gets large enough to be apparent like the one Miller had, he is practically incapacitated, with reference to the performance of labor or transaction of business."

Another physician also described the effect a trouble of the kind described by Dr. Dawson would have upon a person as did Dr. Dawson. The evidence shows that at the time of Miller's death in Arizona he had had the night previous one of his attacks, in which the family despaired of his passing the night, but on the morning afterwards his son was going to town when Miller decided to go with him. About a mile from home a spell came on again, and the son carried him to a neighbor's house, where he died in a very short time. Dr. J. W. Foss testified that he was with Miller at his death, and further testified as follows:

"I knew William J. Miller during his lifetime, and was called on to attend William J. Miller on the occasion of his last sickness. He called at my office several times, and I attended him. On the day he died I was called to the house where he died and was present when he

died. I know the cause of the death of William J. Miller. Some time prior to William J. Miller's death I had examined his body for the purpose of determining his affliction, and determined that his affliction was arterio sclerosis. The direct cause of the death of William J. Miller was acute dilatation of the heart and arterio sclerosis, which was primarily caused by syphilis. In my opinion that was the cause of his death, and syphilis contributed to the affliction. William J. Miller had syphilis and had suffered from that disease from five to six years. Syphilis causes degeneration of the tissues of the body. A weakening and arterio sclerosis follows that, so that acute dilatation might come from that cause, or it might come from something else. In my opinion, in the case of the death of William J. Miller, syphilis was the underlying cause, and both the acute dilatation of the heart and arterio sclerosis were caused directly from syphilis. I made out the death certificate for William J. Miller shortly after April 11, 1913, and the causes of death stated by me in said certificate were acute dilatation of the heart and arterio sclerosis contributed to by syphilis. I have attached to this deposition a true and correct copy of the certificate signed by me and marked 'Exhibit A' for identification. Syphilis is a serious disease and proves fatal in its final determination in a large per cent. of cases by reason of its being the primary cause of many afflictions which produce secondary causes which produce the final death, such, as in this case, where acute dilatation of the heart and arterio sclerosis resulted. Syphilis contributes to bringing about other diseases, and the most common diseases that it does produce are arterio sclerosis, aneurism, insanity, degeneration of the nervous system, paralysis, chronic nephritis, and acute dilatation of the heart.

"I first became acquainted with William J. Miller in Phœnix, Ariz., about four months before the date of his death, which was on April 11, 1913. I first attended upon Miller professionally January 10, 1913. Miller was at my office at the times when I attended him, except on the date of his death, April 11, 1913, when he was at the home of Garth Cate. I did not see him at his office or at his home. He came to my office, and no one was present on the occasions when I attended him professionally. Miller died at the house of Garth Cate, Phœnix, Ariz. I examined his body before death at my office on several occasions, the first examination being made January 10, 1913. No one was present at such examination."

There are facts from which the jury were authorized to infer that Miller never had the disease attributed to him by Foss, and that the trouble from which Miller suffered was not caused by or contributed to by such disease, and that he died from an aneurism of the aorta, as alleged in the petition. The evidence introduced in the case shows simply a conflict on the issue as to the cause of his death. On the issue of settlement we shall notice the testimony thereon further on in the opinion.

[1] The first assignment of error presented is that it was error on the part of the court to refuse to instruct the jury to return a verdict for defendant. The first proposition presented thereunder is that the evidence conclusively shows that W. J. Miller was not immediately and continuously disabled from performing every duty pertaining to his occupation as the direct and proximate cause of an accident, "independent of all other causes," in accordance with the meaning of said phrase, and as contemplated by the pol-.

icy. As will be perceived, this proposition includes two distinct and severable propositions: (1) That Miller was not immediately and continuously disabled from performing every duty pertaining to his occupation; (2) the injury was not independent of all other causes. If there was no immediate and continuous disability to perform every duty, the beneficiary should not recover, is asserted by the proposition; or, if disabled from a cause which did not, independent of all other causes, disable the insured, but that such cause was only a concurring cause and not the sole cause producing the disability, a recovery could not be had. If the evidence failed as a matter of law to establish the affirmative of either proposition, the plaintiff should not recover. The evidence establishes that the insured, Miller, was injured from an accidental blow in the chest which at the time totally disabled him. This injury was to the aorta, which finally produced death. There is evidence that Miller attempted to work and accepted compensation for superintending the well, but it is shown by the testimony of those who were with him that he was unable to remain at work or at the duty of superintending but a short time on any occasion; that he was compelled by his condition to desist from his duties and to seek rest by laying down. The doctors who testified to the injury both say he could not exert himself in any way without endangering his life; that all that was left was to rest and await the inevitable hour. His condition falls in that class of cases, we think, which the courts recognize as a total disability. It has been held that, where the policy limits the right to indemnity to a continuous period of disability, the continuity is not broken by the fact that the insured returned to his work at long intervals and worked for only short periods while still suffering from the injury. Pacific Mutual Life Ins. Co. v. Branham, 34 Ind. App. 243, 70 N. E. 174; Continental, etc., v. Mathis, 150 Ky. 477, 150 S. W. 507. Absolute physical and mental disability, it does not occur to us, should be required.

The injury in this case shows that ordinary care and prudence would preclude the pursual of the business of superintending the sinking of the well, or of any labor, mental or physical. The very fact that Miller tried to do the work, but owing to his disability was compelled to desist and leave the management almost exclusively to his foreman, evidences the fact that he was totally unfit and disabled from performing the duties required by the business. It is contended he could advise his foremen and through them direct his work. His wife testifies that such consultations and efforts rendered him weak and nervous and brought on fits of coughing. The doctors testified that exertions of this kind would bring on just such paroxysms of coughing, which would likely produce immediate fatal results. We regard

the rules announced and discussed in the case of Fidelity & Casualty Co. v. Joiner, 178 S. W. 806, in which a writ of error was denied by the Supreme Court, 188 S. W. xvi, applicable to this case. The opinion in that case is well fortified by the authorities therein cited. Commonwealth Bonding, etc., v. Bryant, 185 S. W. 979; Fidelity, etc., v. Getzendanner, 93 Tex. 487, 53 S. W. 838, 55 S. W. 179, 56 S. W. 326; 14 R. C. L. § 491, Insurance. The appellant cites and relies upon the case of Continental Casualty Co. v. Wade, 101 Tex. 102, 105 S. W. 35, as supporting its proposition that the evidence conclusively establishes that Miller was not continuously and totally disabled. The facts in the case cited are materially different to those in this case. The insured party in that case was disabled 15 minutes from the time of his injury, and the facts therein were undisputed that after the 15 minutes Green, the injured party, resumed his labor and continued to work as usual for 52 days, at the end of which time he died. In this case the facts are uncontroverted that Miller was never able to resume his duties or pursue them as usual, but, on the contrary, show that he was unable to do so, and, when he did attempt it, failed, and that any effort to resume them was at the risk of his life and that this condition continued up to his death.

[2] It is contended by appellant that the evidence conclusively established that Miller died of acute dilatation of the heart and arterio sclerosis, primarily caused by syphilis, and not as the result of an accident. True, Dr. Foss so testified, but an examination of the testimony of this witness convinces us that his testimony was based only on his opinion. This witness attended Miller only in the last days of his life and saw him first about four months before his death. There is expert testimony, if Miller had arterio sclerosis, that a blow would more rapidly break down the walls or coating of the artery, and that the disease named, among a great many others may cause arterio sclerosis. If the injury alone did not produce aneurism of the aorta, or if the disability was not alone produced from this injury, which caused, by an accidental blow, the injury immediately producing the aneurism of the aorta, then the appellee could not recover. Western Indemnity Co. v. McKenzie, 185 S. W. 615. The evidence in this case, however, we think was ample, both from expert and nonexpert, that Miller did not have syphilis and did not die of arterio sclerosis; but, on the contrary, he died from an aneurism of the aorta, caused by the blow received on the chest October 10, 1911. Before that time he was a stout, active, energetic man with no disease; that immediately after that aneurism developed and grew; and that he had the cough which accompanies such an injury to the aorta. It developed at the place the breast was bruised from the blow.

The court would not only have been unauthorized in charging as requested, but, if the jury had found otherwise than they did on this issue, such finding would have been against a decided preponderance of the evidence.

[3] The second proposition under this assignment urges, when the insurance policy provides for notice, liability ceases for failure of such notice, and that no notice was given until 78 weeks after the injury, a recovery would be defeated. The plaintiff in this case alleged Miller fully complied with all the terms of the policy. The plaintiff also pleaded notice and proof of death, and disability. The appellant did not plead want of notice under oath as required by statute and as held necessary in several cases of this kind. Maryland, etc., v. Hudgins, 72 S. W. 1047; Insurance Co. v. Griffin, 58 Tex. Civ. App. 198, 123 S. W. 432; Royal Casualty Co. v. Nelson, 153 S. W. 674; Phœnix, etc., v. Deavenport, 16 Tex. Civ. App. 283, 41 S. W. 399; Floyd v. Ill. Bankers' Life Ass'n, 192 S. W. 607, recently decided by this court, not yet officially reported. There is no evidence in this record showing that appellant did not receive notice of the accident and injury within a reasonable time. In the absence of such sworn pleas required by article 3379, R. C. S. (1895), the presumption is that notice was received. The contract in this case does not expressly provide that a failure to give the notice would defeat a recovery on the policy and the rights of the beneficiary thereunder forfeited. It may be doubted, we think, whether the requirement for notice under the contract is made a condition precedent to the right of recovery, if other facts sufficiently show refusal to pay within the period of limitation; but on this point we make no express holding as we regard the failure to plead under oath, want of notice, and the failure to prove that no notice was in fact received raises the presumption that notice had been given as required by the policy.

[4] The third and fourth propositions under this assignment present that the evidence conclusively shows that a settlement was had between Mrs. Miller and appellant in good faith, free from fraud or misrepresentation, and upon a good consideration; but if it was procured by fraud that it was afterwards ratified by Mrs. Miller. The evidence is sufficient, we think, to authorize a finding that after Miller's death at Phœnix, Ariz., Mrs. Miller brought his body for burial at Dalhart; that while there on that mission and before returning she called upon one Pem Denton about the policy, who wrote the policy for Miller, and who was a friend of the family. Denton undertook to assist her in collecting the policy, and she relied on him implicitly and trusted in him to act to her best interest. She also at that time made arrangements with Mr. Stalcup, an attorney, to represent her in case of litiga-

tion. She was wholly unacquainted with her rights under the policy or the terms of the policy, and relied upon her friend and lawyer to advise her, and she knew but little with reference to the transaction of business, having wholly depended upon her husband during his lifetime. After the burial some few days, an adjuster for the company visited Dalhart and called upon Stalcup, the lawyer, and entered into negotiations for the settlement. The adjuster, a Mr. Scott, offered a settlement to Stalcup which was rejected and which Stalcup's letter to Mrs. Miller indicates was $1,000, which he refused at that time; but he and Scott arranged for another meeting at a fixed date for further conference between them. Scott did not fill his engagement for the second meeting, but instead went to Denton and procured him to go to Phœnix, Ariz., to see Mrs. Miller, where she lived, and to which place she had returned after the burial. Scott at the time he procured Denton drew a draft for the sum of $1,000, payable to Mrs. Miller, and turned it over to Denton to be presented to Mrs. Miller. Denton left Dalhart without letting Stalcup know of his proposed visit to Mrs. Miller, and before leaving he cautioned another party to say nothing about the visit. Denton, when Mrs. Miller was in Dalhart, promised to do the best he could for her and at the same time cautioned her not to settle with any agent who should visit her for settlement. At the time he went to Phœnix, Mrs. Miller had then the care of two minor children and had with her the aged and enfeebled father of her husband, who was then practically helpless. She was then distressed over the recent death of her husband and her financial situation. She was then living practically among strangers, where she had gone shortly before her husband's death for his health. Denton, when he arrived, announced that he was in a hurry to return, and told her he must return that day for Texas. He stated to Mrs. Miller that he had brought for her $1,000; that she was lucky to get it; that under the policy she could not have recovered anything for the reason that her husband received $25 per week for superintending the well and this would prevent a recovery. She believed, so she testifies, that Denton had already made the settlement for her and that he had done the best he could for her. She was ignorant that her attorney had refused this amount in settlement, and the attorney was ignorant that Denton had gone to her to induce her to take the draft. She was also ignorant that Denton was acting for Scott and not as her friend and for her best interests. She knew nothing of this matter until Stalcup wrote her in rather an angry way for having made such a settlement. Her letter to Stalcup in reply shows that she did not fully understand the matter at the time she accepted the draft, and she

states to Stalcup she thought he knew all about it.

There are several circumstances which tend to show she was overreached in this transaction through the acts and representations of one in whom she had trusted as a friend to look after her best interests, and would tend to show that she was induced to believe that the matter in fact had been settled by her trustee, agent, or friend, and that the $1,000 represented the settlement obtained by him and the attorney. She evidently believed in accepting this amount that it was agreed by them as the amount to which she was entitled under the policy. She therefore made no agreement to settle in so far as assenting to the terms of the agreement. She was ignorant of the facts which constituted her rights, but was only acting upon the trust reposed in her representatives. The facts show that her attorney knew nothing of the matter, and Denton is shown to have been acting for Scott, who selected him doubtless because he knew the trust Mrs. Miller placed in him. It was therefore a one-sided agreement, obtained by acts and declarations calculated to deceive, and which in fact did deceive, Mrs. Miller into believing a settlement had been reached upon a fair consideration of her rights. The fraud therefore consisted in taking advantage of her distress, grief, and ignorance as to her rights or of matters of business, and of the confidence reposed in Denton, who had accepted the trust of aiding her. The procuring of the purported settlement under such circumstances was calculated to lead her to believe her attorney had acquiesced thereto, and that he had advised the course, and that he and Denton had made the settlement after reaching an understanding.

[5] The verdict of a jury will not be disturbed when the evidence discloses suspicious circumstances of a character to induce the belief that any artifice has been practiced or that confidence reposed has been abused to the complaining party's injury. Varner v. Carson, 59 Tex. 303; Ramey v. Allison, 64 Tex. 697; U. S. Gypsum Co. v. Shields, 101 Tex. 473, 108 S. W. 1165; Henderson v. Railway Co., 17 Tex. on page 576, 67 Am. Dec. 675; 2 Pomeroy's Equity Jurisprudence, §§ 955, 956, 963; 20 Cyc. 34.

[6] The next question presented is that Mrs. Miller afterwards knowingly ratified the settlement. The record shows the suit was instituted August 26, 1913. On May 22, 1913, appellant, through Denton, procured the alleged settlement. On September 4, 1913, Scott, the agent for appellant, drew up an affidavit reciting the reception of $1,000 from appellant in settlement of her claim under the policy. In this affidavit she makes the request to the court before whom a case was then pending to dismiss it. It appears from the record that her attorney neglected to inform her that she could set aside the settlement; but when he wrote to her the inference to be drawn from the correspondence is that she had disregarded him in the matter of the settlement, and that he therefore demanded his part of it as compensation for his services up to that time. This she sent to him, apologizing, however, that when she accepted the $1,000 she thought he knew all about it and acknowledged that she had made a mistake and was misled, giving in part as her excuse her condition and situation; that she began to suspect after Denton left her on the day of the settlement that there was something wrong. Her evidence renders it reasonably certain that she never did know that she had a right to set aside or attack the settlement for fraud. At the time she made the affidavit, Scott told her that if the case was not dismissed she would have to pay the costs of suit and would likely be required to refund the money paid her. He also said that her lawyer did her a mean and dirty trick in not notifying her of the suit. It is true that before she signed the affidavit she consulted a lawyer, but it is not shown that she or Scott ever told the lawyer the facts and circumstances under which the settlement was obtained. He evidently acted upon the theory, in his advice to her to sign the affidavit, that the settlement was fairly made. The evidence shows that Scott did most of the explaining to the attorney, and that Mrs. Miller said but little, for the reason that she knew but little of the true facts leading up to the settlement. We think it is evident from this record that Stalcup failed to advise Mrs. Miller of her right to impeach the settlement. When he wrote to her, he evidently was very angry and gave her no advice; but after receiving her letter in reply he then filed the suit on the policy, and it is inferable in order to stop the prosecution of the suit Scott visited Mrs. Miller in order to get her to dismiss the case, appealing to her fear of losing the amount paid her, and of being mulcted in costs, and by advising or stating to her that her attorney, in bringing the suit, without notice to her, did her a mean and dirty trick. Situated as she was, in ignorance of her rights, thinking, as she states, that however obtained the settlement could not be set aside, the jury, as we believe from all the facts and circumstances, would be authorized to find she did not with full knowledge ratify the settlement obtained by fraud.

"If the act is simply a continuation of a former transaction, or if the party wrongfully supposes that the original contract or transaction is binding, or if he has not full knowledge of all the material facts and of his rights, no act of confirmation, however formal, is effectual; the voidable nature of the transaction is unaltered." 2 Pomeroy's Equity Jurisprudence, §§ 964, 849; Ingram v. Abbott, 14 Tex. Civ. App. 583, 38 S. W. 626, on p. 629; Railroad Co. v. Gorman, 79 Kan. 643, 100 Pac. 647, 28 L. R. A. (N. S.) 643.

[7] It is also urged by appellant that the settlement in this case cannot be set aside

because upon discovering the fraud appellee did not tender back the $1,000 received. This the evidence indicates appellee was not able to do. She, in her supplemental petition, admitted that the appellant was entitled to a credit of $1,000 paid, and prayed that it be allowed as such against any judgment she might obtain. To require her to pay back the $1,000 before she could have set aside the fraudulent settlement would have worked a great hardship on her. The following authorities hold that she was not required, under the circumstances, like the present, to tender the money so received: Insurance Co. v. Findley, 29 Tex. Civ. App. 494, 68 S. W. 698; Railway Co. v. Shuford, 36 Tex. Civ. App. 251, 81 S. W. 1197; Railway Co. v. Cade, 93 S. W. 124; Railway Co. v. Jowers, 110 S. W. 946; Jones v. Railway Co., 32 Tex. Civ. App. 198, 73 S. W. 1082; McCarty v. Railway Co., 21 Tex. Civ. App. 568, 54 S. W. 421. The question here presented is not without difficulty under some of the authorities, but we regard the action of the Supreme Court upon the writs of error on some of the above cases as settling the rule substantially as above stated. Where a settlement is set aside upon the ground of fraud inducing the settlement, as in this case, the tender of the money received is not required. Doubtless, where a settlement is fairly entered into by parties who are on equal terms, upon a disputed claim, the rule would require a tender of the amount actually paid in settlement before a suit could be maintained thereon. The reason for the rule as applied in this case is clearly stated in the Jowers Case, supra.

The fifth proposition has been considered under the first proposition, this assignment. The first assignment is overruled for the reasons above stated.

The second, third, and fourth assignments urge certain objections to the issues submitted by the court, Nos. 2, 4, and 5, and are mainly based upon the proposition that under the facts, contract of insurance, and the settlement and ratification, there was no issue of fact to be determined by the jury. These objections are sufficiently noticed in considering assignment No. 1.

[8] The objections filed to the issues also urge certain exceptions to the charges given in connection with the respective issues submitted. If the assignments are sufficient to include the objections to the terms of these charges, we yet think they are not subject to the criticisms urged. The charges are not on the weight of the evidence. We shall consider at this place only the charge in connection with issue No. 2, which is as follows:

"In connection with your consideration of this issue, you are instructed that by the phrase 'total disability that prevented him, the said William J. Miller, from performing any and every kind of duty pertaining to his occupation,' as above used, is meant such disability as would prevent the said William J. Miller from performing substantially, or to some material ex-

tent, any and every part of the business pertaining to his occupation, or such disability as that ordinary care in the preservation of his life and health would require that he desist from the transaction thereof."

In the case of Young v. Travelers' Ins. Co., 80 Me. 244, 13 Atl. 896, the court therein suggests that a charge to the purport of the one above given would be proper. Our Supreme Court, in Fidelity Co. v. Getzendanner, 93 Tex. 487, 53 S. W. 838, 55 S. W. 179, 56 S. W. 326, cites the Young Case with approval. In the case of Commonwealth, etc., v. Bryant, 185 S. W. 981, the Court of Civil Appeals quotes from Hohn v. Inter-State Casualty Co., 115 Mich. 79, 72 N. W. 1105, in which it was said the court could properly have instructed the jury, using almost literally the language used in the charge in this case. Lobdill v. Laboring Men's, etc., 69 Minn. 14, 71 N. W. 696, 38 L. R. A. 537, 65 Am. St. Rep. 542; Turner v. Fidelity, etc., 112 Mich. 425, 70 N. W. 898, 38 L. R. A. 529, 67 Am. St. Rep. 428, "total disability" is defined in the policy as disability "that prevents the assured from performing any and every kind of duty pertaining to his occupation." As suggested in the Joiner Case, 178 S. W., supra, the word "prevent" is synonymous with the word "hinder." Undoubtedly, if Miller was hindered in the performance of any and every kind of duty pertaining to his occupation, it would not be error to tell the jury it must be such as hindered or prevented substantially or to a material extent any and every part of the business pertaining to his occupation, and such that ordinary care and prudence required in the preservation of his life that he desist therefrom. We regard the charge as being authorized by the facts and sanctioned by our courts and others. Assignments 2, 3, and 4 are overruled.

[9] The fifth assignment urges error in the refusal of special charge No. 2. We believe issues Nos. 2, 2a, and 3, and the charge given by the court in connection with issue No. 3, hereafter quoted, and the findings of the jury thereunder, were sufficient and rendered the refusal of the charge immaterial. The court, in submitting the issues in this case, and in his charge, recognizes the rule in Western Indemnity Co. v. MacKechnie, 185 S. W. 619, and did not fall into the error of the trial court in that case. The charge in this case so worded the issues that there could have been no misunderstanding by the jury.

[10] The sixth assignment will be overruled. The court submitted the only issue, total disability, raised by the pleadings. There was no issue raised by the pleadings of partial disability, and we perceive no necessity for giving the charge requested by appellant on that issue, in the form in which it was requested.

[11] The seventh and eighth assignments are overruled. We do not think the issues

here sought should have been given. The charge of the court confined the jury to a finding that the death of Miller must have been occasioned by the accident alone and from no other cause; but his charge, given in connection with issue No. 3, below quoted, substantially submitted the issue here sought. Without entering into a discussion of the ninth, tenth, eleventh, and twelfth assignments on a refusal of certain issues requested, we think the court presented the issues raised in the pleadings, and it was not necessary for the jury to find whether certain evidence was true or false. Most of the issues requested and refused present in different form the issues submitted by the trial court. The court gave the following instruction:

"And in connection with special issue No. 3, you are charged that if from the evidence that said William J. Miller died of acute dilatation of the heart and arterio sclerosis, primarily caused by syphilis, you will answer said special issue, 'It did not.'"

Issue No. 3 and this charge in connection therewith presents every issue fairly as to the cause of the death raised by the pleadings and urged by appellant, and will cover most of appellant's special issues upon which assignments are based.

[12] We think there is no importance to be attached to appellant's contention that this issue was in an obscure portion of the charge. There is no contention the charge was not read and submitted to the jury. We see no material error which could have resulted to appellant by having placed this paragraph in the portion of the charge selected for it.

The fourteenth and fifteenth assignments are overruled. We see no error in the admission of the evidence complained of; but, on the contrary, its admission was proper under the circumstances, especially under the limitation imposed upon it by the trial judge at the time of its submission.

[13, 14] The fifteenth (sixteenth?) assigns error in excluding the certificate of Dr. Foss as to the death of Miller. The witness testified fully as to the cause of Miller's death. The certificate offered was an ex parte declaration by Foss and not admissible. If, however, it should have been admitted, there was no injury, as the appellant obtained the full benefit of the certificate through Foss' testimony adduced upon the trial.

[15] We think the court properly rendered judgment for $500 attorney's fees. Demand was made after Miller's death, and refused. The appellant in this case pleaded a settlement, which the jury found was obtained by fraud. The sixteenth assignment is therefore overruled.

The charge of the court amply covered the issue requested under the seventeenth assignment. On the question of ratification the court instructed the jury they must find that

Mrs. Miller repudiated the settlement within a reasonable time after discovering the fraud, and, if she did not do so, the jury were then told to find that the settlement could not be set aside.

[16] There was no error in refusing requested issues Nos. 21 and 3. These issues sought to have the court submit special facts which were included in the ultimate fact to be found. It would have been error, in our judgment, to have submitted them in the form requested.

The nineteenth and twentieth assignments are overruled. The court's general charge covered the issues requested and here sought for submission, and, in so far as they were applicable to the facts and law of the case, were given by the court in his issues and general charge to the jury.

[17] The twenty-fourth assignment is overruled. Under the terms of the policy, as we understand it, and especially sections 3 and 15 thereof, all amounts accruing under the policy, both before and after the death, and on account of Miller's death, are payable to the beneficiary.

The twenty-fifth to the thirty-eighth assignments urge error on the part of the court in overruling certain exceptions to the supplemental petition of appellee. These assignments seek, in a different form, to raise the same questions urged to the sufficiency of the evidence and will be overruled for the reasons given in discussing the evidence.

We have concluded the case under the record should be affirmed, and it is so ordered.

BOYCE, J., not sitting.