## GREAT SOUTHERN LIFE INS. CO. v. JOHNSON. (No. 2813.)

Court of Civil Appeals of Texas. Amarillo. April 13, 1927.

Rehearing Denied May 11, 1927.

1. Insurance &—665(5)—Evidence held to sustain finding that amputation of leg, necessitated by injury, permanently and wholly prevented insured from performing work for compensation within life insurance policy.

Evidence *held* to sustain finding that, as result of injury necessitating amputation of his leg above the knee, insured, who was a dry goods merchant, was permanently and wholly prevented from performing any work for compensation or profit or following any gainful occupation within life insurance policy entitling him to payment of one-tenth of face of policy for 10 years in case of such injury.

2. Insurance &—146(3)—Insurance contract will be construed liberally in favor of beneficiary.

An insurance contract will be construed liberally in favor of beneficiary named therein, and, if language of policy is susceptible of an interpretation which would make company liable, such liability should be enforced.

3. Insurance &—669(12) — Instruction that phrase, "wholly and permanently disabled by bodily injury or by disease," in life policy, does not imply absolute disability to perform any labor, held not objectionable.

Instruction that phrase, "wholly and permanently disabled by bodily injury or by disease," so that insured will be permanently and wholly prevented from performing any work for compensation or profit, or from following any gainful occupation within life insurance policy entitling insured to one-tenth of face of policy annually for 10 years in such case, does not imply an absolute disability to perform any kind of labor, *held* not objectionable, where evidence showed that insured had become wholly and permanently disabled, so as to be prevented from performing any work for compensation or profit.

Appeal from District Court, Wichita County; W. W. Cook, Judge.

Action by Harold Irwin Johnson against the Great Southern Life Insurance Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Vinson, Elkins, Sweeton & Weems, of Houston (Fred R. Switzer, of Houston, of counsel), for appellant.

Ragsdale & Brannan, of Burkburnett, for appellee.

RANDOLPH, J. This suit was instituted by appellee upon a policy of life insurance issued to him by appellant, dated March 12, 1920, in the full sum of $20,000, and further containing provisions for the company waiving annual premiums and the payment to the insured of one-tenth of the face of the policy, to wit, $2,000 annually, for 10 years, upon satisfactory proof by the insured of disability from disease or bodily injury so that "he (the insured) is and will be permanently, continuously, and wholly prevented from performing any work for compensation or profit or from following any gainful occupation."

The case, on trial was submitted to a jury upon special issues, and, upon the answers to same by the jury, the trial court rendered judgment for appellee, and from such judgment this appeal is taken.

The appellee sued for the sum of $2,000, being the amount of 10 per cent. of such policy, together with the sum of $461.48, the difference between the amount of the premiums paid by him after his injury, and a loan of $1,250.91 on the policy on March 12, 1924, and also seeking to have the remaining nine installments of the policy paid annually by appellant.

The judgment rendered by the trial court was for the sum of $2,000, 10 per cent. of the policy, and $461.48, the said difference between the amount of premiums paid and the said note, but refused to render judgment maturing the other nine installments; this refusal to mature said installments being without prejudice to the rights of either party in any future litigation.

The paramount question in the case, is whether or not the evidence discloses that, within the legal interpretation of the above-quoted term of the policy, the appellee, by reason of his injury, "is and will be thereby permanently, continuously, and wholly prevented from performing any work for compensation or profit or from any gainful occupation."

In order to arrive at a proper determination of this question, it is necessary to make a full and comprehensive statement of the evidence as relates to the injury to the defendant and his incapacity to work.

[1] The following is a substantial statement of the evidence covering said question:

Appellee was a merchant in business in Burkburnett, Tex. He had in various years, prior to his going to Burkburnett, been engaged in the mercantile business in Alvarado, Snyder, Tahoka, and Memphis, Tex., and at all times while engaged in such busi-

---

&—For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ness made money. At the time of the taking out of the policy sued on, appellee and his brother were engaged in such mercantile business in Burkburnett, and said business was estimated to have been worth at that time $125,000. Appellee had never followed any other vocation than the dry goods business. From the time he was 18 years old he followed the occupation of clerk or salesman in the dry goods business or general work in that line until he engaged in business for himself. After his injury, he continued in the mercantile business for some little time, finally having to take bankruptcy.

Appellee paid the initial premium of $570.80 when he made application for the policy, and thereafter paid the other premiums as they matured until he filed this suit.

On the night of December 13, 1921, at a point about 50 miles from Fort Worth, while riding in a car with another party, a shotgun which was being carried in the car was accidentally discharged. The shot striking appellant about four inches above the knee in the center of the leg. The party with him drove appellee to Sanger, where he got a doctor who gave him "something"—a hypodermic. The doctor accompanied him to Fort Worth, and when they got there his leg was X-rayed, and it showed to be so bad that it was decided to amputate it, and a Fort Worth surgeon performed the operation. About five inches of the stump leg was left. Appellee had considerable trouble with it; the nature of his trouble was that he had an infection, one right after another, for a period of several months. For a period of a few months his condition did not improve, but after some time he began to get better, but he was compelled to have a second operation about a year and a half later, which never healed.

The doctor took a picture of the leg, and there was a growth in there, caused from an infection, and the doctor took that off. That operation was not quite as bad as the first one, but was almost as serious. The leg had considerable infection for a period of about a year. The condition of the stump now is that it is very tender, and at times it has a very severe pain in it. At times it is just a dull aching pain. It is not like it was in the beginning, but there is a little discharge, sometimes more than six weeks apart. There is more pain now than there was before the second operation.

Appellee has made the effort to wear an artificial limb, but it is impossible for him to wear it on account of the pain it gives. Wearing the artificial limb puts him in bed within an hour on account of temperature, whenever he puts it on.

There is no covering over the end of the bone in the stump, and but little skin; there is something over 4½ inches of the bone left from the hip joint down.

Appellee had, as stated, years of experience in the dry goods business, and understood and performed all of the duties in connection with the dry goods business himself, but at the present time cannot perform any of those duties.

To get a better understanding of the evidence, we quote from the appellee's testimony, as follows:

"There is work, to begin with, in the dry goods store, that I cannot get around to do; for one thing, I am considerably handicapped to get goods down to show to customers; for another thing, I am considerably handicapped to get around; and, another thing, I cannot get a job. I have tried to get a job from various dry goods people. I have applied for employment. I tried the Monnig's Dry Goods Company at Fort Worth, H. J. Justin & Son, the Southern Hosiery Company, the Stermes Novelty Company of Dallas. Those parties that I have mentioned, I bought goods from, all of them but one, and they knew my general qualification, that I had ability before the injury to perform that kind of work. They refused me employment.

"I told the jury that part of the time I cannot work because of pain in that stump. At times it is severe and more especially at night. When I lose a full night's sleep, the next day I am in no condition to work. I cannot get around; I do not have the strength. My heart action was normal I believe at the time I took out this policy of insurance and previous to that. The Great Southern Life Insurance Company passed me and issued the policy of insurance without any question. My heart action now, after an exertion that amounts to anything, runs from 115 to 125. It would be something around 80, I believe, at normal. That weakens me; I cannot hardly get around. I have been examined by a physician two or three times with reference to my heart action. I consulted a physician at Hillsboro. I say that my heart action runs as high as 125 at times; that is, when I am in my severest pain from my leg, and from exertion. Since the injury, for the past few years, I first started selling fender braces, which a concern in Burkburnett manufactured; it was a good brace, and I thought that I could put it over, but I did not meet with any success in it. I stayed with it until I lost money—not on account of the merits of the brace. I figured that they would get more capital, but they did not get any more capital, and then I started selling wrenches, and I did not do any good with that, and then I started selling window cleaners and then I started selling razor strop compound, and between the wrenches, window cleaners, and razor strop compound, if I had been able to have worked all of the time, I believe that I could have made a living, because I had had lots of experience as a salesman, meeting the public, but my expenses go on all the time, whether I am able to work or not.

"The various occupations I have followed since the injury have not been gainful to me financially. I have not, of course, since that time, worked in any department of the dry goods business, nor been able to get a job. I worked something like five or six months on the fender brace business. With respect to those things that I did before I was injured,

I did not do anything. As to whether, if I could get a job in the dry goods business, I could do any of that business. I could not hardly answer that 'Yes' or 'No.' There is a portion of the time that I may sell some of the goods in the store, some little things that I could get. I have no qualifications as an office man or anything of that kind; I have no training in that respect, I, of course, now go on crutches all of the time. I have not followed anything in the way of occupation since I was injured that I followed before I was injured. As a result of my work in the various occupations that I have followed since this injury, I have been unable to make a gain or profit. I have been prevented from making a gain or profit by reason of my disability resulting from certain injuries."

Nathan Lynch, a merchant in Burkburnett, testified that Mr. Johnson would not be qualified as a clerk and to perform services necessary in his store, because he could not get around. He also testified the first time he knew of Johnson Bros. that they had the biggest business in Burkburnett; that he does not know what appellee did in the store at that time; a man suffering the loss of one leg could not do a considerable part of the duties that he performed; he could not do any part of them; that a man who suffered the loss of one limb could not perform any considerable part of the duties that he performed in connection with his business. "If I had a leg off, I believe that my business would quit me, and that such a man could not run a store."

R. L. Henry, another merchant at Burkburnett, testified: That he knows Mr. Johnson, has known him 7 or 8 years. "He was a very successful man. I recognized him as one of the best and foremost and liveliest dry goods men in our town and one of our most successful merchants." That he was acquainted with him at the time of his injury resulting in the loss of his leg, and has known him continually since. Taking into consideration his disability at the present time and at all times since he lost his leg, Mr. Johnson could not perform the duties of a dry goods clerk in a dry goods store. He could not perform the duties that are required of a man to supervise a store and a business of that kind. He is disqualified for that, and the personal effect he would have on meeting the trade and on his health would disqualify him as well.

G. R. Kincaid testified as to Johnson's disabilities practically the same as the above witnesses.

H. A. Dodson, of the Karo Motor Company, engaged in selling Ford automobiles and Ford accessories, etc., testified: That he had known Mr. Johnson about three years; that he employed Mr. Johnson at one time. He worked for witness from October until about the first of the year. That the fact that Johnson could not produce the business resulted in his voluntarily quitting the job. That he realized that he was not producing the business, and that the witness could not keep him on his pay roll, could not pension him, and he voluntarily resigned. Appellee was then selling what is known as the "Ford Weekly Purchase Plan"; that is, selling automobiles on a deferred payment plan. The reason of his failure to make good in that line, his inability, is attributed to his lack of being able to get around as a salesman is required to do in that position. The reason why witness gave appellee the employment was through his friendship with one of his office men, Mr. Barron. Mr. Barron asked him to give appellee employment, if it was possible, to see whether he could work there profitably, and witness tried him out. After he tried him out, witness said he had not the ability to perform that character of work devolving upon a salesman. He could not perform the duties devolving upon a supervisor or general manager of the business. Witness has no position that appellee could perform. Witness paid appellee $125 a month, but, as he could not afford to give a man $125, he let him go.

W. D. Utts, cashier of the Farmers' State Bank at Burkburnett, knows the appellee in this case, up to the time of his injury. The witness says:

"The only way any one could tell whether he was a successful merchant after this injury —he made a success, made lots of money before the injury—he just continued to lose, go down; ultimately he had to take the bankruptcy."

He testified also that appellee could not perform the duties of a clerk in a store, and in his condition could not perform services in a bank.

Appellee, being recalled, testified as follows:

"I was interrogated about this fender brace business. I say that I was in that business something like six months. My expenses, the necessary expenditures in earning those commissions, were in excess of the amount of commissions earned by me. That is true of all of the things in which I had been engaged since the injury. Since this last operation that I told the jury about, I have a continuous dull aching pain in that leg. At times it is very severe. At other times it is not quite so bad. At times it is something like a headache. At times when this pain is severe my heart action gets pretty bad and I get pretty weak. That occurs sometimes two or three times a week. When that pain is severe, the effect it has on me as to my ability to do work is that I cannot do anything hardly. I do not have the strength. It affects my sleep. I often lose a whole night sometimes with it."

This statement will be sufficient to give an idea of the physical and mental condition of the appellee, of his attempt to make a living, of the various methods adopted by him which were practical tests of his ability to work

for compensation to support himself. This being true, what is the result of his demonstration? We find him as a merchant, and a successful merchant, handling a business worth $125,000. He is injured. His business goes to wreck, and he becomes a bankrupt. In a sincere and sustained effort to make a living, in face of his pain and suffering, in face of the fact that he had to walk on crutches, with a wound in the stump of his leg, that had never healed, he faces conditions and does what comes to hand. Through the several years of his effort, he goes from bad to worse. He makes no such compensation as will exceed the expenditures, and finally has honestly and fairly demonstrated that he is practically helpless.

Under these conditions, what is the spirit and intention of the law in the interpretation of his contract of insurance?

We cannot concede that this evidence shows that the appellee was not wholly prevented from performing any work for compensation or profit, or from following any gainful occupation, but we do think that the reverse of the proposition is true.

[2] It is elementary that an insurance contract will be construed liberally in favor of the beneficiary named therein, and that such construction will be placed upon it as comports with common understanding of its provisions. If the language is susceptible of an interpretation which would make the company liable, then such liability should be enforced.

In the case of North American Insurance Co. v. Miller (Tex. Civ. App). 193 S. W. 750, the facts were substantially: That Miller received an injury while superintending the work in sinking a deep well. A rope broke. and the machinery was released thereby, which caused the casing, to which was attached a wrench, to revolve rapidly. As the wrench came around, the end of it struck Miller in the upper chest and knocked him flat on his back. This blow rendered him unconscious. He was placed in a conveyance and carried home. The blow rendered the place on his chest black and bruised. Miller, on the day he received the injury, was placed in bed, but the next morning was able to get up and return to work. In the afternoon he was again brought home and placed in bed, and remained there for about two weeks. During these two weeks there developed on his chest at a point where he was struck what his wife designated a small "bunch," perhaps an inch and a half in diameter. That he complained of severe aching across the breast, and this place where the bruise was seemed to pulsate as the heart would beat and felt like the pulse. He also developed a cough, which was described as being a very peculiar cough, unlike a cough from an ordinary cold; some of the witnesses described it such as a cow would give—a harsh rasping cough. That this protrusion or bunch continued to grow, and continued painful and had the pulsation described up to the time of his death. This protrusion, as described by his wife, was something like four inches in diameter, and protruded an inch and a half, so much that it would hold his shirt out. He was always short of breath, and during the time he was sick in bed, he would be excited and nervous during any consultation on business and exhausted when such consultation was over. Just thinking about it, would have such an effect on him that it would exhaust him and affect his breathing and start his cough. When he went to bed, he would have to be propped up. His wife took him to Arizona for the benefit of a lower altitude, where he died in April, 1913; the accident having occurred in October, 1911.

Passing upon these facts, Judge Huff, speaking for this court, said:

"The first assignment of error presented is that it was error on the part of the court to refuse to instruct the jury to return a verdict for defendant. The first proposition presented thereunder is that the evidence conclusively shows that W. J. Miller was not immediately and continuously disabled from performing every duty pertaining to his occupation as the direct and proximate cause of an accident, 'independent of all other causes,' in accordance with the meaning of said phrase, and as contemplated by the policy. As will be perceived, this proposition includes two distinct and severable propositions: (1) That Miller was not immediately and continuously disabled from performing every duty pertaining to his occupation; (2) the injury was not independent of all other causes. If there was no immediate and continuous disability to perform every duty, the beneficiary should not recover, is asserted by the proposition; or, if disabled from a cause which did not, independent of all other causes, disable the insured, but that such cause was only a concurring cause and not the sole cause producing the disability, a recovery could not be had. If the evidence failed as a matter of law to establish the affirmative of either proposition, the plaintiff should not recover. The evidence establishes that the insured, Miller, was injured from an accidental blow in the chest which at the time totally disabled him. This injury was to the aorta, which finally produced death. There is evidence that Miller attempted to work and accepted compensation for superintending the well, but it is shown by the testimony of those who were with him that he was unable to remain at work or at the duty of superintending but a short time on any occasion; that he was compelled by his condition to desist from his duties and to seek rest by laying down. The doctors who testified to the injury both say he could not exert himself in any way without endangering his life; that all that was left was to rest and await the inevitable hour. His condition falls in that class of cases, we think, which the courts recognize as a total disability. It has been held that, where the policy limits the right to indemnity to a continuous period of disability, the continuity is not broken by the fact that the insured returned to his work at long intervals

and worked for only short periods while still suffering from the injury. Pacific Mutual Life Ins. Co. v. Branham, 34 Ind. App. 243, 70 N. E. 174; Continental, etc., v. Mathis, 150 Ky. 477, 150 S. W. 507. Absolute physical and mental disability, it does not occur to us, should be required.

"The injury in this case shows that ordinary care and prudence would preclude the pursual of the business of superintending the sinking of the well, or of any labor, mental or physical. The very fact that Miller tried to do the work, but owing to his disability was compelled to desist and leave the management almost exclusively to his foreman, evidences the fact that he was totally unfit and disabled from performing the duties required by the business. It is contended he could advise his foreman and through them direct his work. His wife testifies that such consultations and efforts rendered him weak and nervous and brought on fits of coughing. The doctors testified that exertions of this kind would bring on just such paroxysms of coughing, which would likely produce immediate fatal results. We regard the rules announced and discussed in the case of Fidelity & Casualty Co. v. Joiner [Tex. Civ. App.] 178 S. W. 806, in which a writ of error was denied by the Supreme Court (188 S. W. xvi), applicable to this case. The opinion in that case is well fortified by the authorities therein cited. Commonwealth Bonding, etc., v. Bryant [Tex. Civ. App.] 185 S. W. 979; Fidelity, etc., v. Getzendanner, 93 Tex. 487, 53 S. W. 838, 55 S. W. 179, 56 S. W. 326; 14 R. C. L. § 491, 'Insurance.' The appellant cites and relies upon the case of Continental Casualty Co. v. Wade, 101 Tex. 102, 105 S. W. 35, as supporting its proposition that the evidence conclusively establishes that Miller was not continuously and totally disabled. The facts in the case cited are materially different to those in this case. The insured party in that case was disabled 15 minutes from the time of his injury, and the facts therein were undisputed that after the 15 minutes Green, the injured party, resumed his labor and continued to work as usual for 52 days, at the end of which time he died. In this case the facts are uncontroverted that Miller was never able to resume his duties or pursue them as usual, but, on the contrary, show that he was unable to do so, and, when he did attempt it, failed, and that any effort to resume them was at the risk of his life, and that this condition continued up to his death." (Writ denied.)

In the case of Commonwealth Bonding Co. v. Bryant (Tex. Civ. App.) 185 S. W. 979, where the insurance policy provided for the payment to Bryant of an indemnity against bodily injuries, effected directly or indirectly, of all other causes, through external, violent, and accidental means, both parties had requested a peremptory instruction, and the trial court had instructed a verdict for Bryant for the compensation sought by him.

On appeal, the Court of Civil Appeals held that the peremptory charge so given was not excepted to, and hence, the alleged error could not be considered from the standpoint of the giving of the peremptory instruction in favor of Bryant, but they do consider the Commonwealth Company's assignment because of the refusal of the trial court to instruct a verdict for the company and, passing upon the question of Bryant's disability as contemplated by the terms of the policy, held that the issue of disability should have been submitted to the jury, and say:

"Now, while we have not attempted to set out the evidence in the case, it appears that appellee could perform some of his duties while some of them he could not perform. It also appears from the evidence what his duties were. As to whether he was totally disabled to perform those duties was a relative question of fact for the determination of the jury under appropriate instructions from the court. The case cited from our own Supreme Court does not suggest what would be a correct charge in such cases, but, as said in Hohn v. Inter State Casualty Co., 115 Mich. 79, 72 N. W. 1105: 'Total disability must, of necessity, be a relative matter, and must depend largely upon the occupation and employment in which the party insured is engaged. * * * He was not able to prosecute his business unless he was able to do all the substantial acts necessary to be done in its prosecution.' In the same case it was said that the trial court could properly have charged the jury that. 'to entitle the plaintiff to recover, he was not required to prove that his injury disabled him to such an extent that he had no physical ability to do what was necessary to be done in the prosecution of his business, but that it was sufficient if he satisfied them that his injury was of such a character and to such an extent that common care and prudence required him to desist from his labors, and rest as long as it was reasonably necessary to effect a speedy cure so that a competent and skillful physician called to treat him would direct him to do so.' Such are the reasons why we conclude the peremptory instruction was properly refused; and for such reasons we would have held the peremptory instruction given for appellee erroneous had the action of the court in that respect been properly challenged."

Application was made to the Supreme Court for a writ of error, which was granted.

Reviewing the decision of the Court of Civil Appeals, the Supreme Court reversed the decision of that court (240 S. W. 893) because of the trial court's peremptory instruction to the jury in favor of appellee, holding that the issues should have been submitted to the jury.

Upon the merits of the question of disability, as contemplated in the contract of insurance, Associate Justice Greenwood says:

"The court will not give such a literal interpretation to the language of this contract, wherein the larger weekly indemnity is promised, as to practically relieve the insurer of all obligation thereunder. Such would be the effect of a decision discharging plaintiff in error from all liability if defendant in error, after his injury, could do anything required of him as a railroad conductor. Hefner v. Fidelity & Casualty Co., 110 Tex. 605, 607, 222 S. W. 966. The language of the policy is fairly and justly susceptible of the interpretation, which, we think, should be

given to it, that the larger indemnity was promised if the injuries rendered the insured substantially unable, in the exercise of ordinary care, to perform every material duty pertaining to his occupation. Fidelity & Casualty Co. v. Getzendanner, 93 Tex. 487, 53 S. W. 838, 55 S. W. 179, 56 S. W. 326; Fidelity & Casualty Co. v. Joiner (Tex. Civ. App.) 178 S. W. 808 (writ of error refused); North American Accident Ins. Co. v. Miller (Tex. Civ. App.) 193 S. W. 755 (writ of error refused); 14 R. C. L. 1316; 5 Joyce on Insurance (2d Ed.) § 3032 (c); Foglesong v. Modern Brotherhood of America, 121 Mo. App. 548, 97 S. W. 240; Lobdill v. Laboring Men's Mutual Aid Ass'n, 69 Minn. 14, 71 N. W. 696, 38 L. R. A. 537, 65 Am. St. Rep. 542. Who can doubt that the insured actually believed that he had at least the stated degree of indemnity, under the policy, or that the insurer actually intended him to so believe? We are certain that any construction of the language of the policy, more favorable to the insurer, would not accomplish, but would defeat, the real intent and purpose of the contracting parties."

The Court of Civil Appeals at Galveston, through Chief Justice Pleasants, in the case of Home Life & Accident Co. v. Corsey, 216 S. W. 464, approves, as having been settled by the authorities, that—

"The phrase 'total incapacity for work,' as used in Workmen's Compensation Act, does not imply an absolute disability to perform any kind of labor, but a person disqualified from performing the usual tasks of a workman in such a way as to enable him to procure and retain employment is ordinarily regarded as totally 'incapacitated' "—citing, among other cases, Moore v. Peet Bros., 99 Kan. 443, 162 P. 295, and In re Sullivan, 218 Mass. 141, 105 N. E. 463, L. R. A. 1916A, 378.

We can see no reason why this definition of the phrase as used in Workmen's Compensation Act (Vernon's Ann. Civ. St. 1925, art. 8306 et seq.) should not be applicable here. The fact that the appellee in the case at bar had made a long, continuous effort to earn compensation and to engage in a gainful occupation was a complete demonstration of his inability to do so, and demonstrated that from the time of his injury he was "wholly and permanently disabled" within the meaning of the terms of the policy.

[3] In submitting the case to the jury, the trial court gave the following preliminary explanatory charge:

"Instruction No. 1. You are instructed that the phrase, 'wholly and permanently disabled by bodily injury or by disease,' so that he is and will be thereby permanently, continuously, and wholly prevented from performing any work, for compensation or profit, or from following any gainful occupation as set out in the policy sued on herein, does not imply an absolute disability to perform any kind of labor. Bearing in mind the foregoing instruction then answer:" (Here submitting the issues upon which the jury made their findings below noted.)

The only objections made to this charge by appellant were:

"(1) The defendant objects and excepts to the court's instruction No. 1, for the reason that it does not correctly define the provisions of the policy, and authorizes the jury to find for the plaintiff without the plaintiff being required to prove such case as the terms of the policy provide; for the reason that the policy stipulates the conditions upon which recovery can be had, and the definition as set out therein limits the words used in the policy.

"(2) The defendant objects and excepts to the submission of special issue No. 1, for the reason that the words 'total disability' do not comply with the terms of the policy, in that the word 'totally' is not used in the policy, and it does not submit to the jury whether or not he is prevented from performing work for compensation or profit or from following another gainful occupation, and there is no evidence that his disability is total.

"(3) The defendant objects and excepts to the submission of all of the special issues and instruction No. 1, for the reason that under all of the proof in the case it is not shown that the plaintiff is entitled to recover under the provisions of the policy."

If we are correct in our holding upon the provision of the policy as stated above, that the facts in evidence show that appellee has become wholly and permanently disabled, by bodily injury or disease, so that he is and will be thereby permanently, continually prevented from performing any work for compensation or profit, or from following any gainful occupation, within the interpretation given that language in the insurance contract, it naturally follows that this explanatory charge was not subject to the objections made to it.

Upon the issues submitted to them, the jury found that the injury sustained by the plaintiff totally disabled him; that such disability was permanent; and has been permanent to the present time; that such disability will continue for the remaining portion of plaintiff's natural life.

We are of the opinion that the evidence sustains these findings.

We have carefully considered the remaining propositions and assignments of error, and, finding no reversible error, we affirm the judgment of the trial court.