FIDELITY & CASUALTY CO. v. JOINER.†
(No. 1481.)

(Court of Civil Appeals of Texas. Texarkana. June 16, 1915. Rehearing Denied June 24, 1915.)

1. APPEAL AND ERROR ⬅1002 — EVIDENCE ⬅570—OPINION EVIDENCE—EXPERT TESTIMONY.

The weight of expert testimony is for the jury, and their finding based on conflicting medical testimony will not be disturbed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3935–3937; Dec. Dig. ⬅ 1002; Evidence, Cent. Dig. § 2395; Dec. Dig. ⬅570.]

2. INSURANCE ⬅524—ACCIDENT INSURANCE— "TOTAL DISABILITY" — "PREVENT" — "HINDER."

Where an accident policy provided certain indemnities if injuries to the insured resulted in total disability, preventing him from performing all duties pertaining to his occupation, the injuries need not be such as to physically prevent the insured from performing any of the duties; it being enough if he is so injured that he cannot, as a prudent man, perform any such duties, and the word "prevent" being construed as synonymous with hinder.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1310; Dec. Dig. ⬅524.

For other definitions, see Words and Phrases, First Series, Hinder; also, First and Second Series, Total Disability; Prevent.]

3. INSURANCE ⬅665—ACCIDENT INSURANCE— ACTIONS—EVIDENCE.

In an action on an accident policy, evidence held to warrant a finding that the insured was, from the time of injury till his death, totally disabled from performing his customary duties.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1707–1728; Dec. Dig. ⬅ 665.]

4. INSURANCE ⬅527 — ACCIDENT POLICIES — CONSTRUCTION.

Under an accident policy providing a double indemnity in case insured should be injured while riding in the conveyance of a common carrier, an automobile of a liveryman in which insured was injured must be deemed the vehicle of a common carrier, where it was in charge of the hirer's driver, and the liveryman served any member of the public able to pay his fixed charges, as would any common carrier.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1312, 1313; Dec. Dig. ⬅527.]

Appeal from District Court, Grayson County; W. M. Peck, Judge.

Action by James Roe Joiner against the Fidelity & Casualty Company. From a judgment for plaintiff, defendant appeals. Affirmed.

The suit was by appellee, the beneficiary named in an accident policy issued to his father, J. R. Joiner, by appellant.

By its terms the policy insured said J. R. Joiner—

"against bodily injury sustained during the term of one year from noon, standard time, of the day that this policy is dated, through accidental means (excluding suicide, sane or insane, or any attempt thereat, sane or insane) and resulting directly, independently and exclusively of all other causes, in (a) immediate, continuous and total disability that prevents the assured from performing any and every kind of duty pertaining

---

to his occupation, (b) immediate (as respects the injury or as respects preceding total disability) and continuous partial disability that prevents the assured from performing fully work essential to the duties of his occupation, (c) death; as follows:

"Article 1. If the assured suffers total disability the company will pay the assured so long as he lives and suffers said total disability twenty-five dollars a week.

"Art. 2. If the assured suffers partial disability the company will pay the assured for the period of such partial disability not exceeding twenty-six weeks, a percentage of the weekly indemnity before specified, to be determined upon the extent of the disability, but not less than 25 per cent. nor greater than 90 per cent.

"Art. 3. If the assured suffers total disability, and if, during the period of said total disability, the assured suffers death as the direct result of the bodily injury causing the said total disability; or, if within ninety days from the date of the accident, irrespective of total disability, the assured suffers death; the company will pay the beneficiary five thousand dollars and for such part of the period between the date of the accident and the date of the death as the assured has not been paid a weekly indemnity an additional sum of twenty-five dollars a week."

"Art. 5. The amounts specified in the preceding articles shall be doubled if the bodily injury is sustained by the assured: * * * (2) While in or on a public conveyance (including the platform, steps or running board thereof) provided by a common carrier for passenger service."

In his petition appellee alleged that:

"On or about the 4th day of June, 1913, while said policy was in full force and effect, the assured therein, to wit, J. R. Joiner, while riding in or on a public conveyance provided by a common carrier for passenger service, to wit, an automobile, sustained bodily injuries, from which said assured suffered immediate total disability, which total disability continued until the 9th day of December, 1913, upon which date said assured died as the direct result of said bodily injuries. Plaintiff says that said bodily injuries which caused said total disability and death of said assured were the direct result of, and were proximately caused by, the automobile in which said assured was riding, as aforesaid, being wrecked and overturned from accidental causes unknown to plaintiff, while said automobile was being operated for passenger service by a common carrier along a public highway and road and while said assured was riding in said automobile as a passenger; he having paid the customary fare charged therefor by the owner and operator thereof. Plaintiff says that by reason of the total disability and death of said J. R. Joiner, as aforesaid, the defendant has become indebted to plaintiff, under the provisions of said policy of insurance, in the sum of $11,342.70, together with interest thereon from the 9th day of December, 1913, until paid at the rate of 6 per cent. per annum; said total amount being apportioned as follows: Double indemnity for death, $10,000; double indemnity at the rate of $50 per week for the period of total disability, which plaintiff alleges to have been 27 weeks less one day, $1,342.70. Plaintiff says that no weekly indemnity was paid to the insured or to any one else for him."

Appellee prayed for a recovery against appellant of the aggregate of the sums specified and interest thereon, and in addition thereto for a recovery of the penalty and attorney's fees provided for by article 4746, Vernon's Statutes.

In its answer appellant denied that the assured "suffered immediate total disability, which total disability continued until December 9, 1913, upon which date he died, as the direct result of said bodily injury received while riding in or on a public conveyance provided by a common carrier for passenger service," and denied that the total disability and death of the insured "was the direct result of and proximately caused by the wreck of an automobile, which automobile was being operated for passenger service by a common carrier," as charged by appellee; and, after setting out provisions in the policy quoted above, alleged that it was not liable because "the injuries received by the plaintiff did not result in his death within 90 days from the date of such injuries," and because said injuries "did not result in total disability as defined in the policy, as hereinbefore set out, and such total disability did not continue from the date of said accident until the date of the death of the assured."

Appellant further alleged that the death of the assured "was not caused by bodily injuries sustained by him and resulting directly, independently, and exclusively of all other causes," and the injury to the assured was not sustained by him "while in or on a public conveyance (including the platform, steps, or running board thereof) provided by a common carrier of passengers for hire, and that it is not liable to the plaintiff herein for double indemnity under the terms of said policy."

The insured traveled as a salesman for a firm of wholesale groceries in Sherman. Wednesday afternoon, June 4, 1913, accompanied by a boy as driver and one Wilson, also a traveling salesman, he left Whitesboro in an automobile, intending to go to Southmayd, Gage, and other nearby towns, to see customers there. While moving rapidly, a short distance out from Whitesboro, the automobile turned over, throwing the insured, Wilson, and the boy to the ground, injuring each of them. Wilson testified:

"When I got up, Mr. Joiner had something over his feet; don't know whether it was a part of the seat or something; don't know what it was. He was trying to pull his feet, and I started to pull him up, and he said he was all right, to look after the boy: 'Look after G.' He called him G. So I went over and picked G. up. I thought he was dead. He was unconscious. That was the driver. And I leaned him up on the seat, and he was groaning a little, and I asked Mr. Joiner if he didn't think I had better get a doctor, and he said yes, and I went up the road about a quarter of a mile and phoned for a doctor, and when I came back Mr. Joiner was up and the boy had come to, and a buggy came along about that time, and they were putting him in the buggy. Mr. Joiner was helping. Mr. Joiner was conscious. He was sitting up on the ground there when I went off to the house after the doctor, and the boy was still unconscious. After I came back from telephoning, I took this boy up to that house and took him in the house and put him on a bed and came back down to the car. Brought some water down there and gave Mr. Joiner a drink of water, and we picked up our belongings and walked on up to the house. Mr. Joiner and I walked on up to the house. We got to the house just about the time the doctor did and went in

there, and the doctor dressed the boy's wounds first and then dressed Mr. Joiner's. Then we got in a car and went back to Whitesboro. * * * When we got to Whitesboro, Mr. Joiner went up and went up to bed. * * * Mr. Joiner was skinned up all over; nose was skinned and lip was cut, lower lip was mashed, and he had a black eye; don't remember which eye it was; one or the other was black; elbow was skinned; his knee was skinned about four to six inches long; and four of his toes were smashed. He had a bruise on his breast here, and a bruise on his head; on the left side of his head, right along above his ear there."

On special issues submitted to them, the jury found the facts to be: (1) That on June 4, 1913, near Whitesboro, the insured, as the result of an accident while riding in an automobile belonging to one U. G. White, sustained bodily injuries which directly, independently, and exclusively of all other causes resulted in immediate, continuous, and total disability that ever thereafterward prevented him from performing any and every kind of duty pertaining to his occupation, and in his death on December 9, 1913. (2) That the automobile in which he was riding was a public conveyance provided for passenger service by said U. G. White, who prior to and at the time of the accident held himself out to the public as ready and willing to carry for hire all persons indifferently who might apply to him for passage.

On the facts so found, the court rendered the judgment in appellee's favor against appellant for $15,006.45, from which the appeal is prosecuted.

Thomas & Rhea, of Dallas, for appellant. Head, Smith, Maxey & Head, of Sherman, for appellee.

WILLSON, C. J. (after stating the facts as above). [1] There are 37 assignments, but as we view the record the disposition which should be made of the appeal depends upon the answers to these questions: (1) Was there evidence to support the finding that the death of the assured was due "directly, independently, and exclusively of all other causes" to the injuries he sustained? (2) Was there evidence to support the finding that said injuries resulted in "immediate and total disability" that continuously thereafterwards prevented the insured "from performing any and every kind of duty pertaining to his occupation?" (3) Was there evidence to support the finding that the automobile was a public conveyance provided by a common carrier for passenger service? If either of the two questions first stated should be answered in the negative, then the contention of appellant that it appeared as matter of law that it was not liable for the indemnity specified in the policy against death of the assured by accident should be sustained. If both should be answered in the affirmative and the third in the negative, then the judgment is for an excessive amount. Only in the event each of the questions should be answered in the affirmative is the judgment altogether right.

During many years immediately preceding the time the accident occurred, and when it occurred, the assured enjoyed excellent health. As a result of injuries he then suffered, he was confined to his bed in Whitesboro during two or three days. He then returned to his home in Sherman, where he remained (in bed, the greater part of the time) until June 22d, when he made a trip to Whitesboro and back. In the afternoon of June 23d, he was stricken with paralysis of the right side of his body, and, as a consequence thereof, from that time until he died on December 9th was helpless. Physicians, testifying for appellee as experts, thought the injury the assured had suffered to the left side of his head so affected his brain as to cause the paralysis and his death, but conceded that it might be true, as other physicians, testifying for appellant, thought it was, that the paralysis and death of the assured was due to another or other causes. We do not agree with appellant in its contention that the testimony referred to showed that the first of the three questions stated above should be answered in the negative. Had the physicians all agreed that the death of the assured was due to the injury to his head, doubtless it would not be contended that the testimony then would not be sufficient to support the finding of the jury. That the experts, as is usual, disagreed, was not a reason why the jury should ignore the testimony of all of them. They had a right to conclude, as they did, that the opinions of those who testified for appellee were entitled to the greater weight.

[2, 3] We do not understand appellant to be in the attitude of insisting, with reference to the second question, that the injuries the assured suffered did not result in "immediate and continuous" disability. Its contention, as we understand it, is that his disability was not total, within the meaning of the language used in the policy. The contention is based on testimony referred to above and other testimony showing that the trip made by the assured to Whitesboro on June 22d was for the purpose of transacting business pertaining to his occupation, and that while in Whitesboro on that trip the assured solicited an order from one of his customers and received payment of a debt due from another. Appellant insists it therefore conclusively appeared that the assured "did perform duties pertaining to his occupation after said accident," and concludes that it therefore further appeared as matter of law that he was not "totally disabled" within the meaning of the contract. We agree it conclusively appeared, as claimed, that the assured after he suffered the injuries performed duties pertaining to his occupation, but we do not agree that his doing so established as matter of law that he was not "totally disabled" within the meaning of those words as used in the

policy. It not infrequently happens that one suffering from injuries to his person performs duties pertaining to his occupation which he is wholly unable, in the reasonable and proper sense of those words so used, to perform; and that, as a consequence, because he was unable to do same, he suffers death or an aggravation of his injuries. In a case in which such a result follows the performance of the duty, the performance thereof, instead of establishing that the assured was able to perform it, it seems to us, would establish the contrary. We think therefore that to construe the language in the policy as meaning what appellant contends it means would be unreasonable. "Total disability," said the Supreme Court of Minnesota, in Lobdill v. Aid Ass'n, 69 Minn. 14, 71 N. W. 696, 38 L. R. A 537, 65 Am. St. Rep. 542—

"does not mean absolute physical inability on the part of the insured to transact any kind of business pertaining to his occupation. It is sufficient if his injuries were of such a character that common care and prudence required him to desist from the transaction of any such business so long as it was reasonably necessary to effectuate a cure. This was a duty he owed to the insurer as well as to himself."

And see Continental Casualty Co. v. Wynne, 36 Okl. 325, 129 Pac. 16; Great Eastern Casualty Co. v. Robins, 111 Ark. 607, 164 S. W. 750; Mutual Benefit Ass'n v. Nancarrow, 18 Colo. App. 274, 71 Pac. 423; James v. U. S. Casualty Co., 113 Mo. App. 622, 88 S. W. 125; Hohn v. Interstate Casualty Co., 115 Mich. 79, 72 N. W. 1105; U. S. Casualty Co. v. Hanson, 20 Colo. App. 393, 79 Pac. 177; Turner v. Casualty Co., 112 Mich. 425, 70 N. W. 898, 38 L. R. A. 529, 67 Am. St. Rep. 428; Thayer v. Standard Life & Accident Ins. Co., 68 N. H. 577, 41 Atl. 182.

With reference to this phase of the case, Dr. Neathery, the assured's physician, testified:

"I knew of his undertaking, or of his proposed undertaking, to go back on the road. He consulted me about it. I told him he had better not do it; didn't think he was able; that he might go right along but might not; might not be best for him."

The witness White, who saw the insured in Whitesboro on the occasion of his trip to that town June 23d testified with reference to his condition then:

"He was in mighty bad condition then. I would say he wasn't able to be out at all, wasn't able to work, from his looks. I had been associated with Mr. Joiner for years, and from what he had been, and what he was then, he wasn't able to be out in my judgment. Mr. Joiner was a stout, robust man before this accident. He was just the opposite on that Monday morning when I saw him. * * * He looked bad and got around in bad shape; had a bad color and bad expression."

The witness Mitchell testified that he met the assured as he left the train to stop at Whitesboro June 23d, and during the day saw him at McGehee's office.

"He was sitting in a chair up there," the witness said. "Seemed to be in a sort of stupor. I didn't speak to him. Looked like he probably might have been asleep. He walked slowly, and seemed like when he got to the hotel he was in an exhausted condition; seemed out of wind, short of breath."

The witness Sloan, the customer of whom he solicited an order on the occasion of his trip to Whitesboro, heretofore referred to, testified:

"When Mr. Joiner came in (to witness' store), he seemed to be almost exhausted; rather nervous. Seemed to be suffering from some cause. He didn't seem or appear at all like himself, because he had always been a stout, robust man. That day he seemed to be so weak he was hardly able to transact business, as I thought. With reference to his mental activity, he seemed to be just like any man would in a weakened condition. He seemed to be in accord with his physical condition."

The witness Burchett, who was the customer heretofore referred to as having paid the assured a debt on the occasion of his trip to Whitsboro June 23d, testified:

"Mr. White brought him (the assured) down to my place of business in an automobile. I suppose he ran the machine to within some 10 or 12 feet from the door, probably. Mr. Joiner got out of the automobile and came to the door, and he caught hold of the door casing with one hand and used his cane with the other to get in the house. He had to step up a step somewhere between six and eight inches high. He did that apparently with a great deal of difficulty. * * * He stepped up to the counter, and he stood there, I suppose, something like a minute and just made the remark to me, says, 'I have got to sit down,' and he sat down in a chair. He stood there something like a minute. He was apparently thoroughly exhausted physically."

Whether the insured was "totally disabled" or not, within the meaning of the policy, in view of the testimony referred to, was, we think, a question for the jury. Therefore we are of opinion the second of the three questions should be answered in the affirmative. It follows we are further of opinion the trial court did not err when he refused appellant's requested charge instructing the jury to find in its favor.

In reaching the conclusion indicated, the fact that the words "total disability," used in the policy, are defined therein as disability "that prevents the assured from performing any and every kind of duty pertaining to his occupation," has not been overlooked. But when it is remembered that the word "prevent" is synonymous with the word "hinder," and that the latter might properly be substituted for the former where it is used in the quotation made from the policy, it is obvious that appellant has no cause to complain that we ignored the definition; for undoubtedly the jury had a right to find from the testimony that the disability the assured suffered as a result of the injuries "hindered" him in the performance of every kind of duty pertaining to his occupation.

[4] The automobile in which the assured was riding at the time the accident occurred belonged to the witness U. G. White, who operated a hotel and livery business in Whitesboro. White testified that in his business as

a liveryman he owned and used horses, hacks, buggies, and two automobiles, which he hired to any one who applied to him for same and was willing to pay according to a schedule of charges he had established. He used the automobiles in his business like he did the buggies, except that he never hired them out without a driver, but always himself furnished drivers for them. His testimony, we think, was sufficient to support the finding of the jury that the automobile in which the assured was riding was a "public conveyance provided for passenger service." Primrose v. Casualty Co., 232 Pa. 210, 81 Atl. 212, 37 L. R. A. (N. S.) 618; Ripley v. Assurance Co., 16 Wall. 336, 21 L. Ed. 469. In the Primrose Case the Supreme Court of Pennsylvania said:

"The words 'public conveyance, provided for passenger service, and propelled by gasoline,' are to receive a reasonable meaning. All conveyances are either for public or private use. The automobile in the case at bar was not one for merely private use. It belonged to a company which, as already stated, was engaged in the business of hiring automobiles for general public use. The use of no one of its machines was limited to any particular person, but any one able to pay the price for the privilege of riding in it, while it was under the control of and being operated by one of the company's employés, could do so."

Was the testimony also sufficient to support the further finding that White in his business as a liveryman was a "common carrier?" If it was, then the judgment is not erroneous in any respect.

Appellant insists that the determination of the question "is absolutely controlled by the case of McGregor v. Gill, 114 Tenn. 521, 86 S. W. 318, 108 Am. St. Rep. 919," decided by the Supreme Court of Tennessee. But we think that case in its facts is not at all like this one. The plaintiff there sought a recovery against a liveryman for personal injury suffered by his (the plaintiff's) wife, as the result, he claimed, of the negligence of the driver of a wagon furnished by the liveryman, in which the wife was riding. The case is like many others made the basis of a rule which has been stated and explained as follows:

"Ordinarily, livery stable keepers, engaged in the business of letting for hire teams and vehicles, either with or without drivers, are not carriers of passengers within the legal meaning of that term. They do not hold themselves out as undertaking for hire to carry indiscriminately any person who may apply. Those who hire their vehicles are not necessarily restricted to vehicles or drivers designated by the proprietor, but may in a measure protect themselves by selecting the particular horse or driver they wish to hire. The duties and obligations of carriers of passengers are therefore not applicable to mere livery stable keepers." 1 Hutch. on Carriers, § 96.

When the testimony in the case before us is kept in mind, it is clear that the rule announced by Mr. Hutchinson and invoked by appellant should not control in the decision of the question. Here White, the liveryman, testified:

"In holding myself out to the public for business, I hold out to carry all, and do not make restrictions as to who I carry. I am in the livery business to favor the public. When any one comes along, I accommodate them if I can. * * * I do not make restrictions as to who I will carry. I have just one price in the livery business, and charge all the same. * * * I would carry anybody that wanted to go and pay the price. * * * I hauled anybody that wanted to go and had the money and would pay the price."

When it is remembered that a "common carrier," within the meaning of the law, is one who "undertakes for hire to carry all persons indifferently who may apply for passage, so long as there is room and there is no legal excuse for refusing" (1 Bouvier, 561), and that "the destination of, or distance to be traveled by, the passenger is immaterial in determining whether the carrier is or is not a common carrier" (5 A. & E. Enc. p. 481, and authorities there cited), it is not easy to understand why it should be held that the testimony referred to was not sufficient to support the finding of the jury that White was a "common carrier" of passengers. According to his testimony, White undertook for hire to carry all persons indifferently who applied to him for carriage. If he did that, he was, within the meaning of the law, a common carrier of passengers, and the jury had a right to find he was.

The assignments not disposed of by what has been said are overruled, and the judgment is affirmed.

---

⬅⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Writ of error pending in Supreme Court.