### JEFFERSON STANDARD LIFE INS. CO. v. CURFMAN.

#### No. 12750.

Court of Civil Appeals of Texas. Dallas.

March 4, 1939.

Rehearing Denied April 8, 1939.

Malone, Lipscomb, White & Seay, of Dallas, and Carl Miller, of Rockwall, for appellant.

Wade & Wade, of Rockwall, for appellee.

BOND, Chief Justice.

On August 11, 1924, on forms furnished by Jefferson Standard Life Insurance Company, appellee made application for life insurance, listing farming as his occupation. The Insurance Company accepted the application and, in accordance with the representations therein and the payment of an annual premium of $59.40, issued to appellee a life insurance policy in the principal sum of $2,500, containing provisions for total and permanent disabilities, reading:

"If after one full annual premium shall have been paid on this policy, and before default in the payment of any subsequent premium, the Insured shall furnish to the Company due proof that he has been wholly and continuously disabled by bodily injuries or disease and will be permanently, continuously and wholly prevented thereby from pursuing any occupation whatsoever for remuneration or profit, provided, that such total and permanent disability shall occur before the anniversary of the policy on which his age at nearest birthday is sixty years, the Company by endorsement in wrting on this contract will agree to pay

"(a) The premiums which shall become payable after receipt and approval of proof of said disability and during the continuance thereof, and

"(b) Commencing immediately from the receipt and approval by the Company of the original proofs of disability, provided the Insured is still disabled, a monthly income during the lifetime of the Insured, accruing from the date of approval of the proofs of total and permanent disability, prior to the maturity of this policy as an endowment or death claim, of one per cent of the face amount of this policy. The amount otherwise payable at the maturity of this policy shall NOT be reduced by any premiums or installments paid under the above provisions. If disability is total but not obviously permanent it shall be presumed to be permanent after continuous total disability for three months and the waiver and installments shall accrue from the beginning of the fourth month of such continuous total disability after receipt and approval of proof of said total disability by the Company.

"Without prejudice to any other cause of total and permanent disability, the entire and irrecoverable loss of the sight of both eyes, or loss of the use of both hands at or above the wrists, or the loss of the use of both feet at or above the ankle, or the loss of one limb and one eye, or the loss of the use of one hand at or above the wrist and one foot at or above the ankle, shall be considered total and permanent disability within the meaning of this provision.

"Proofs of continued total and permanent disability shall be furnished as often as required by the Company on forms prescribed by the Company and any medical adviser of the Company shall be allowed to examine the person of the Insured in respect to any alleged disability at any time, but not oftener than every six months after the first two years of disability.

"If, however, the Insured fails to furnish due proof or if he recovers so as to be able to engage in any occupation whatsoever for remuneration or profit, the Company's obligation to pay installments or premiums shall cease and the Insured shall resume the payment of premiums on the premium due date following such failure or recovery, any premiums or installments already having been paid by the Company NOT being charged as a lien hereon.

"The payment of any premium by the Company shall increase the values in the Table of Values incorporated in this policy in the same manner as if the premiums were being paid by the Insured.

"While any Non-Forfeiture provision other than automatic premium loan is in effect, or in event of total and permanent disability occurring after the policy anniversary on which his age at nearest birthday is 60 years, or if the Insured shall engage in military or naval service, or any allied branch thereof, in time of war, no disability benefits shall accrue. But should total and permanent disability as above defined occur after the aforesaid anniversary, then after due proof of said disability and endorsement on this contract as above provided, premium payments subsequently falling due will be advanced as a loan without interest secured by this policy. Upon written request by the Insured accompanied by this policy for endorsement, the provision for disability benefits may be discontinued."

The paramount question in this case is, whether or not the evidence discloses that, within the legal interpretation of the above quoted provisions of the policy and the attached application, appellee, by reason of his injury, is "wholly and continuously disabled by bodily injuries or disease and will be permanently, continuously and wholly prevented thereby from pursuing any occupation whatsoever for remuneration or profit."

Appellee (plaintiff) alleged that on July 17, 1935, he stepped upon a nail, which pierced his shoe and entered his right foot, resulting in infection, or septic poison, transmitted to his body, causing injury to his nervous system, the muscles, ligaments, tendons and tendon sheaths of his right foot and leg, the loss of his third and fourth toes, and removal of the metatarsal bone of his right foot, which condition has and will render him totally and permanently disabled, thus preventing him from pursuing any occupation for remuneration or profit, within the purview of the contract of insurance.

Appellee further alleged that, in March, 1936, he submitted proofs of his disability, which "proofs" were approved by appellant and disability benefits at the rate of $25 per month were paid to him each month from March 30, 1936, to and including March 30, 1937; that on April 26, 1937, demand, in writing, was made on the Insurance Company for continuation of such payments, which was refused, and liability denied on the policy. Appellee sought recovery for such monthly benefits at the rate of $25 per month from April 30, 1937, to and including May 30, 1938, or an aggregate of $350, with six per cent. interest from maturity date on each installment, twelve per cent. statutory penalty, and for reasonable attorney's fee; and further, for the annual premium of $59.40 paid to appellant, under protest, in September, 1937, with six per cent. interest thereon from date of payment until paid.

Appellant (defendant) answered by general demurrer, certain special exceptions, general denial, and specially alleged the terms and provisions above related as defenses to plaintiff's claim for further benefits; it recognized liability for the claims originally submitted and paid to March 30, 1937, but denied further liability, because (1) of appellee's failure and refusal to submit to plastic surgery, as recommended by the Company's surgeon and physician, to effect a more comfortable foot, and (2) that appellee has been, is, and will be no longer wholly, continuously and permanently disabled from pursuing some occupation for remuneration or profit.

At the conclusion of the evidence, the cause was submitted to a jury upon special issues and after having been instructed by the charge of the court that "By the term Total Disability, as used herein, is not implied an absolute disability or incapacity to perform any kind of work, but a person disqualified from performing a substantial part of the usual kind of work in which he was engaged at the time of said injury, if any, and further disabled to perform a substantial part of any work or employment which he was able to perform before such injury, if any.", the jury found (1) that the plaintiff, Donald J. Curfman, sustained total disability, as that term has been above defined, from the injuries received to his right foot; (2) that the disability sustained as a result of the injury to plaintiff's right foot is permanent; (3) that $175 is a reasonable attorney's fee for services rendered plaintiff in this cause; and (4) that a person of ordinary prudence, situated as plaintiff Donald J. Curfman is, would not submit to an operation of plastic surgery upon his foot to improve its condition. On the verdict of the jury and the uncontroverted facts, the court entered judgment in favor of plaintiff for the amount in suit.

■ The propriety of the charge of the court on total and permanent disability depends upon the construction of the contract of insurance above quoted. The policy describes the disability necessary for the insured to recover as that which has been total and continuous and which will permanently, continuously and wholly prevent the insured from pursuing any occupation whatsoever for remuneration or profit. Manifestly, a literal interpretation of the language used would practically nullify it. The insured would have no protection whatsoever. No person could qualify for compensation under it. Evidently the policy was intended to cover some disability to a living being and one in possession of his mental faculties. The nearest approach to a person disabled under a strict literal interpretation of the policy is illustrated by the Fort Worth Court of Civil Appeals in Metropolitan Life Ins. Co. v. Pribble, 82 S.W.2d 414, 415, as one "totally

paralyzed and even such a one might get a side show job on the 'midway' "; and, we might add another, one who is absolutely insane. Courts will not give such a literal and narrow interpretation to the language of such a contract as to practically relieve the insurer of any obligation thereunder.

 . The stipulation that, before liability attaches, the insured shall be disabled "from pursuing any occupation whatsoever for remuneration or profit" is an undue restriction on the contract and evidently not within the contemplation of the parties. The insured's application attached to the policy and made a part thereof, expressly recites that his occupation was farming, a representation of a hazard which the Company assumed. The policy having been issued on such representation, evidently, the premium was based on the hazards stated, or on one not more hazardous; thus, the term "occupation" as employed in the accident provision of the policy compasses the main requirements of the insured's calling, vocation, or business.. "The word 'occupation,' as used in an insurance policy * * * · means the vocation, profession, trade, or calling which the assured has engaged in for hire or profit, and does not preclude him from the performance of acts and duties which are simply incidents connected with the daily life of men in any or all occupations, Union Mut. Acc. Ass'n v. Frohard, 134 Ill. 228, 25 N.E. 642, 643, 10 L.R.A. 383, 23 Am.St.Rep. 664; Hess v. Preferred Masonic Mut. Acc. Ass'n, 112 Mich. 196, 70 N.W. 460, 462, 40 L.R.A. 444; or from engaging in mere acts of exercise, diversion, or recreation, and hence a merchant who was killed while hunting could not be said to be engaged in the occupation of a hunter at the time of his death, so that his beneficiary would be only entitled to the indemnity allowed in case of a hunter." 6 Words & Phrases, First Series, p. 4907.

The language of the charge is in substance and almost verbatim as approved in Western Indemnity Co. v. Corder, Tex. Civ.App., 249 S.W. 316; Bishop v. Millers' Indemnity Underwriters, Tex.Civ. App.; 254 S.W. 411; Georgia Casualty Co. v. Ginn, Tex.Civ.App., 272 S.W. 601, 603, and Metropolitan Life Ins. Co. v. Pribble, Tex.Civ.App., 82 S.W.2d 414. In Commonwealth Bonding & Casualty Ins. Co. v. Bryant, 113 Tex. 21, 240 S.W. 893, and Hefner v. Fidelity & Casualty Co., 110

Tex. 596, 160 S.W. 330, 222 S.W. 966, the Supreme Court construed a policy which contracted for payment upon disability to perform the duties of the insured's occupation. The language was slightly different from that in this policy, but in Great Southern Life Ins. Co. v. Johnson, 25 S.W. 2d 1093, 1094, the Commission of Appeals, in an opinion approved by the Supreme Court, in construing a policy contracting against disability "from performing any work for compensation or profit or from following any gainful occupation", which is almost verbatim the language of the policy now before us, said: "The rule announced by Judge Greenwood in that case [Bryant case] applies here." So, Mr. Justice Sharp, in Winters Mutual Aid Ass'n v. Reddin, Tex.Com.App., 49 S.W.2d 1095, 1098, construing a policy which provided for benefits "in the event of the insured becoming totally and permanently disabled", also held that a charge, in substance, that instructs a jury, if the insured is suffering from impairment of his feet of such nature as to render him unable to perform all labor and work necessary to be done to successfully follow the occupation of a tenant farmer, or barber, and *all other substantial occupations open to a laboring man,* then the insured would be totally disabled within the meaning of the policy, was an erroneous charge, citing Commonwealth Bonding & Casualty Ins. Co. v. Bryant, supra; Great Southern Life Ins. Co. v. Johnson, supra; Justice Sharp, also, quoted with approval the holding in the Johnson case that, "a policy requiring payment for total disability ordinarily is not one of indemnity against loss of income but against loss of capacity to work. 6 Cooley's Briefs on Insurance (2d. Ed.) 5536. 'Total disability' is necessarily a relative matter, and must depend chiefly on the peculiar circumstances of each case and on the nature of the occupation or employment and the capabilities of the person injured. It does not mean absolute physical disability of the insured to transact any kind of business pertaining to his occupation, but exists if he is unable to do any substantial portion of the work connected therewith. Id. 5539."

 Appellant contends that a literal interpretation should have been given, and, in effect, the jury instructed that, if the insured's ability to labor and earn money at *some occupation,* which the evidence shows he is suited to, or *could become* suited by education, training, and experience, to pur-

sue the material duties of such occupation for remuneration or profit, he would not come within the purview of the terms of the insurance. We think, under this record, the policy should bear no such construction; the language of the policy should be given that interpretation as will extend some insurance to the insured, as that when his disability by injury or disease has been and will be total and permanent and the indemnity promised be paid, if such disability render the insured substantially unable, in the exercise of ordinary care, to perform a substantial part of his work or employment pertaining to his farming occupation, or any occupation which, by education, training, or experience, he, since the injury, in the exercise of prudence could have done, and be able to do in the future. Fidelity & Casualty Co. v. Getzendanner, 93 Tex. 487, 53 S.W. 838, 55 S.W. 179, 56 S.W. 326; Fidelity & Casualty Co. v. Joiner, Tex.Civ.App., 178 S. W. 806, 808, writ of error refused; North American Accident Ins. Co. v. Miller, Tex. Civ.App., 193 S.W. 750, 755, writ of error refused; 14 R.C.L. 1316; 5 Joyce on Insurance (2d Ed.) Sec. 3032 (c); Foglesong v. Modern Brotherhoods of America, 121 Mo.App. 548, 97 S.W. 240; Lobdill v. Laboring Men's Mutual Aid Ass'n, 69 Minn. 14, 71 N.W. 696, 38 L.R.A. 537, 65 Am.St. Rep. 542.

We do not believe it was within the contemplation of the parties that the insured should educate himself, or go through apprenticeship for another occupation and, perchance, be able to do some occupation, thereby be able to relieve the Insurance Company from the obligations of its contract. It is not believed that it is the duty of the insured to equip himself, by the expense of education, training and experience, to follow some occupation for which he was totally unqualified at the time of the issuance of the contract of insurance, or at the time of the sustaining of the injury. The rule of a liberal construction of such clause of life insurance policies, as involved here—that the disabilities "from pursuing any occupation whatsoever for remuneration or profit"—means that if the disabilities are such that the insured cannot, in the exercise of ordinary prudence, perform substantially all of the material duties of his occupation, any occupation for which he is qualified by training, education and experience, comes within the terms of such provision.

The testimony in the case shows that the insured is 34 years of age, never attained an education above that of the seventh grade in school; that he was a farmer, not equipped for any other occupation by education, training or experience; that he has followed farming and its incidental hard labors all his life, and, since his injury, is not and will not be in the future able to perform the duties of his occupation, or incidental hard labors without severe physical pain. Appellee testified that, in 1936 and 1937, he operated a tractor in road-building for Rockwall County, which required only a sitting posture—no standing or walking— at which employment, he earned about $800; but the work caused him severe pain; he would work for a few days and then rest for several days, in an effort to regain his strength. He said: "Well, it (the driving of the tractor) would make my foot swell up, for one thing. I have had to stop many times long enough to loosen the laces on my shoes. My foot would swell until, and would get so tight, until I couldn't stand it; the vibration of the tractor, and the heat and all. * * * Well, I knew that I was in a weakened condition, but I thought I might build myself up to where I could go on and do something. Q. Why didn't you work it with your right foot? A. Because I couldn't stand it. I couldn't stand to put the pressure on my right foot and work it, but I might have put my heel up there once or twice, but to do that any number of times, I couldn't have stood it at all". He further testified that he could not follow his occupation of farming, or hard labor, without suffering severe pains, and that he was not equipped to perform any other gainful occupation. Dr. Corry, who performed the operation on appellee's foot and treated him for the resulting injuries, corroborated appellee,—testifying that the work of operating a tractor would eventually tear down appellee's nervous system, calculated to cause pain and other injuries, and that, in his opinion, he would never be able to perform a substantial portion of the duties of farming or manual labor, or any other occupation that requires a like physical exertion. The opinion of Dr. Corry is concurred in by the testimony of Dr. Milliken, another physician who had been treating appellee for the injuries he sustained; and also by Dr. Driver, appellant's medical witness, who testified that, in July, 1936, he examined

appellee and made a written report, stating "His disabilities are total at this time and will be until the plastic work can be completed". The plastic work was never undertaken.

After a careful examination of the record, we have concluded that the above related testimony raised an issue of fact for the determination of the jury, and that the charge of the court properly conveyed the issues to the jury, in line with the reasonable interpretation of the provision of the insurance policy. In Great Southern Life Ins. Co. v. Johnson, supra, in construing a provision of the insurance policy similar to the one here, where a·merchant lost his leg about four inches above the knee, after quoting from the Bryant case, supra, the Supreme Court said: "The fact that defendant in error was elected justice of the peace of his precinct and is acting as such is not of itself conclusive that he is following such a 'gainful occupation' as relieves the company, nor that he is not permanently and totally disabled within the terms of the policy. These are questions for the jury or trial court." It may be that appellee was physically able to perform some labor, handicapped as he was with pain and disability on account of the loss of the use of his foot; but that fact would not conclusively negative total and permanent disability within the meaning of his policy. The credibility of witnesses and the weight to be given to their testimony are peculiarly within the province of the jury, and this Court is bound by the verdict, if discarding the adverse testimony and giving credit to the evidence favorable to the plaintiff, the finding is warranted. Jackson v. Langford, Tex.Civ.App., 60 S. W.2d 265; Daggett, et al. v. Corn, Tex. Civ.App., 54 S.W.2d 1098. Texas Indemnity Ins. Co. v. Perdue, Tex.Civ.App., 64 S.W.2d 386.

The appellant contends as error the action of the court in refusing to submit what it asserts was an affirmative defense contained in its requested issues on "partial disability". In connection with the requested issues, appellant prefaced them with the instruction that "partial disability as therein used, means that plaintiff's ability to labor and earn money at some occupation, which the evidence, if any, shows he is suited, or *could become suited, from education, training and experience, to follow,* is only impaired to a certain degree or extent, but not totally destroyed, and he can perform the material duties of such occupation to such an extent as to enable him to pursue such occupation for remuneration or profit". (Italics ours).

We recognize the rule that the defendant is entitled to an affirmative submission of all of its defensive issues raised by the pleadings and the evidence; and, where such issues are not submitted, it devolves upon the defendant to submit to the court timely, proper issues on the defense raised. The defensive issues joined by pleadings and raised by evidence, but not submitted to the jury, will be considered waived in the absence of properly prepared issues, to be submitted to the Court. Miller v. Fenner, Beane & Ungerleider et al., Tex.Civ.App., 89 S.W.2d 506; National Indemnity Underwriters of America v. Washington, Tex.Civ.App., 119 S. W.2d 1071.

The instruction above recited as the basis for finding on the requested issues of partial disability is, we think, vulnerable, in that, appellant's liability would depend upon the insured's being unable to "become suited, from education, training and experience to follow" any occupation for remuneration or profit. We do not think the requested instruction and the issues submitted in connection therewith correctly present a defensive issue that would warrant the court's giving it to the jury.

Furthermore, in this case, we think, the issue of "partial disability" merely tends to contradict plaintiff's cause of action on the question of total disability. "Total disability" and "partial disability" are directly opposite. The burden was on the plaintiff to plead and prove that the injuries he sustained "wholly, continuously and permanently" disabled him in the manner above suggested, and if he failed to meet such burden, necessarily, the defense would prevail; on the other hand, if the pleadings and evidence show total and permanent disability, the plaintiff has met the burden necessary for him to recover, therefore, negatives the issue on partial disability. This would be true even if defendant had pleaded and proven that plaintiff suffered no incapacity. The court is not required to submit the same issue twice in different forms.

In the case of Texas Indemnity Ins. Co. v. Perdue, supra, wherein a writ of error

was refused by the Supreme Court, it is said [64 S.W.2d 388]: "If the evidence offered tends only to negative the cause of action presented, the issue or issues on which such action depends should be submitted affirmatively âs plaintiff has the burden of proof, but the negation of such issue should not be affirmatively submitted. Texas Employers' Ins. Ass'n v. White, Tex.Civ.App., 32 S.W.2d 955." See, also, Texas Employers' Ins. Ass'n v. Moyers et al., Tex.Civ.App., 69 S.W.2d 777; Texas Employers' Ins. Ass'n v. Horn, Tex.Civ. App., 75 S.W.2d 301; Traders & General Ins. Co. v. Peterson, Tex.Civ.App., 87 S. W.2d 322; Traders & General Ins. Co. v. Offield, Tex.Civ.App., 105 S.W.2d 359; Gulf States Security Life Ins. Co. v. Edwards, Tex.Civ.App., 109 S.W.2d 1125.

Bearing in mind the rule announced by the above authorities, and that this is a suit upon a contract of insurance which does not mention "partial disability" as an expressed defense, but only the question of whether or not the insured was injured, which injury "permanently, continuously and wholly" prevented insured "from pursuing any occupation whatsoever for remuneration or profit", as that term is interpreted, the question of partial disability properly presented, would have been merely evidentiary on the issue already submitted affirmatively.

We have carefully reviewed all assignments of error raised in appellant's brief, and finding no reversible error, they are overruled; the judgment of the court below is affirmed.

Affirmed.

### On Motion for Rehearing.

 Where a cause is submitted to a jury, it is the province of the court to accept as true all evidence which, when liberally construed, tends to support the findings of the jury, and all conflicting evidence will be disregarded. Appellee testified in detail that the injuries he sustained to his foot, and resulting injuries to his body and nervous system, prevented him from following his occupation of farming or hard labor, without suffering severe pain; and that he was not equipped, by education or training, to perform any other gainful occupation. His version of his incapacity was accepted by the jury, as reflected in its verdict.

 In our original opinion, is stated: "Dr. Corry, who performed the operation on appellee's foot and treated him for the resulting injuries, corroborated appellee,—testifying that the work of operating a tractor would eventually tear down appellee's nervous system, calculated to cause pain and other injuries, and that, in his opinion, he would never be able to perform a substantial portion of the duties of farming or manual labor, or any other occupation that requires a like physical exertion. The opinion of Dr. Corry is concurred in by the testimony of Dr. Milliken, another physician who had been treating appellee for the injuries he sustained; and, also by Dr. Driver, appellant's medical witness, who testified that, in July, 1936, he examined appellee and made a written report, stating 'His disabilities are total at this time and will be until the plastic work can be completed.'"

Appellant has challenged the statement accredited to the doctors, and draws the conclusion that the doctors' testimony does not corroborate appellee in the details of his disabilities. We believe our expression is not subject to appellant's assignment, but, in view of the challenge, we will suffer the length of this opinion by quoting literally from their testimony:

Dr. Corry testified that, during the course of treatment of appellee's foot, "he was having considerable pain, his foot was swelling, had high fever, and it seemed like he was in a right critical condition. I was afraid of lockjaw or tetanus. He continued to have fever, and his foot swelled even to his knee. From that time on, several openings were made to drain it. Pus formed in different parts of his foot. His foot got infected, his foot and leg; had considerable fever. * * * there was so much gangrene in the fourth toe that it had to be removed * * * and then, in about a week, the next toe had to be taken off. * * * and then the general infection began to subside. * * * It was a question of whether his leg would have to be amputated. In November, it showed some more dead bone. There was necrosis of the fourth metatarsal bone, the fourth long bone of the foot. It was removed and after that, it healed up, but the infection was generally through the foot. In fact, there was a little abscess trying to form up on the leg—pus pockets—a general infection of that limb, or, you might say, plumb to the body, because the lymphatic glands in the groin were inflamed and it looked like they were going to give trouble under the knee. The injury caused the in-

fection. * * * The infection travels up the lymphatics and the tendon sheaths. The infection goes to the body. There has been so much infection there that those tendon sheaths have all contracted and drawn together, interfering with the nervous circulatory distribution. From those several examinations of Donald's foot, and from my experience as a physician, Donald Curfman is not able to pursue and perform the substantial duties of farming, driving a tractor and other labor. He would have trouble in doing manual labor, or farming, or operating a tractor, and I would not advise him to do it, knowing his condition. It would be bound to wear on his nervous system. Anything that you do under pain is likely to upset you in other ways. He will never be the man he was. He is a cripple for life. So far as that foot is concerned, he will never be able to do much foot work, or walking, or any kind of work that requires walking or standing. It will always give him pain."

On cross-examination, Dr. Corry testified that, Mr. Curfman has a 15 per cent rating of the use of his injured foot, and to the extent of 35 per cent, his foot is totally and permanently disabled. "Q. Now Dr. Corry he has got—whatever disability he has got is limited to that foot and leg, is it not? A. Yes" (Re-direct) "Now, Dr. Corry, along that line, that is his disability generally to do anything; is that correct? A. No, I don't think that—so far as his locomotion, getting about on his feet."

Dr. Milliken, who examined, X-rayed, and diagnosed appellee's injuries, necessary elements of prognosis, or treatment, testified by deposition:

"Q. State whether or not you had occasion to examine Donald J. Curfman, on or about the 17th day of April, 1937? A. I did. * * *

"Q. What was the physical condition of Curfman at that time? Please give details as to the nature and extent of the injury, if any? He gave a history of an infection in his right foot which happened July 17, 1935, necessitating a partial amputation of his right foot, leaving him with his great toe, his second toe and his fifth, or little toe, intact, but of the three remaining toes, his great, or first toe, is the only one that is of any material use to him in maintaining his equilibrium while standing or walking. The second toe has a function which I would say was not exceeding 25% of nor-

mal. He has no floor grasp from it while standing. The limited flexion and extension of this second toe is due largely to adhesions of the tendons to their sheathes which prevents the muscles, both flexors and extensors, from acting, and has resulted in a material atrophy or wasting of these muscles, as is shown by comparative measurements of the calves of the respective legs, ½ inch atrophy of the right. The remaining toe of this foot is the little toe or fifth toe, and is in a condition of tendon sheath adhesions, due to the same inflammatory process which caused the disability of the second toe. The space in the foot intervening between the second and fifth toe is occupied by scar tissue which binds the bony and soft structures together, which prevents functioning of this foot. From my examination of Mr. Curfman's foot, on or about April 17, 1937, it is my opinion that its condition was due to an infection from the injury to his right foot. As to whether he was physically able at that time, to pursue any occupation that required physical exertion, I will say he was not able to function, owing to the above described disability. He was not able to do any physical labor that necessitated his standing or walking. He would have to take a sitting position and limit his manual labor to his hands and arms. I had occasion to again examine Mr. Curfman on May 19, 1938, and found that there is no change in his condition from that described above as of April 17, 1937, with the possible exception of callous spots on the sole of his foot at the base of his great toe, which were not present when I examined him on April 17, 1937. I found about one-half inch of atrophy of the calf of the right leg as compared to its fellow, the left. This wasting or atrophy of the calf of the right leg is due to non-use of the muscles due to a partial fixation of the tendons and tendon sheath adhesions which prevents the natural function of the muscle. Evidence of adhesions of the tendons, ligaments or muscles of the right foot and leg was distinctly present, both of the flexors and extensors. The scar tissue over the foot between the second and fifth toe, although the wound had healed, is clear evidence of the inflammation in this region and the limited function of the tendons, flexors and extensors, is further evidence of inflammatory process. Scar tissue in mass occupied the space in his right foot between the second and fifth toes. Based upon my examination, and my experience as a physi-

cian and surgeon, I would say that the scar tissue I have just described would have the effect of binding and fixing the tendons and bone, which prevents their normal function. Tenosynovitis of the right foot and leg is manifested by the fact that the tendons are adherent to their sheath. The tendons, muscles and ligaments of the right leg, were affected by the injury and resulting inflammation, by being bound together and preventing their normal function. There is evidence of inability to flex or extend the ankle of the right leg, to a limited degree, due to the extension of this inflammatory process upon the sheath of the tendons, both flexors and extensors. Inability to flex and extend the right leg, in my opinion, is due to the adhesion of the tendons and sheaths which prevents the natural pulley action of these structures in health. From my examination of Mr. Curfman, the infection and inflammation from said injury extended up to and including the ankle joint only, insofar as I was able to determine, due to the extension of tenosynovitis. Based upon my experience and knowledge as a surgeon, I believe that plastic surgery would not contribute to the usefulness of the foot and leg of Mr. Curfman, and that plastic would tend to weaken an already very much disabled foot. * * * Donald J. Curfman is not, in my opinion, now able to do any substantial portion of the usual tasks of a workman. He is not, in my opinion, able to do any manual labor or farming or driving a tractor for remuneration or profit, and he should not do such labor. It is my opinion that, if Donald Curfman should try to continue the performance of such duties as above described, he would become more disabled, and, because of the disability to this right foot, he should not attempt that type of labor. His injuries were confined to his right foot and ankle of the right foot; whatever disability he has is due to this crippled foot; he has no other disability that I know of".

Dr. Driver testified as to his diagnosis of appellee's foot condition very much the same as Dr. Corry and Dr. Milliken, and then was asked:

"Q. Now Dr. Driver, assuming that nothing is done to that foot, that it remains in the condition in which it was when you saw it for the last time, in January, 1937, I will ask you to tell the jury whether or not, in your opinion, this man would be able to pursue any occupation for gain or profit? (Objection sustained)

"Q. All right, tell the jury, in your opinion, whether or not he is, and in what respect he is incapacitated, if he is? A. The incapacity I find he would have in anything that would require his walking all day and particularly on hard surfaces, but if I may add the other occupations, I don't think so.

"Q. If I understand you correctly, you say that the only disability that you saw would be to some occupation that would require him to stand or walk all day? A. That was my idea."

He then catalogued several occupations, not involving standing or walking, that, in his opinion, Mr. Curfman might be able to do. On cross-examination, the witness testified:

"Now, Doctor, in this report that you made in July 1936, * * * you said there that on account of the infection that plastic work be postponed for two or three months? A. That's right.

"Q. 'His disability is total at this time'? A. That's right.

"Q. 'And will be until the pastic work can be completed'? A. That was my opinion at that time.

"Q. It is still your opinion, is it? A. I don't know about that. I haven't seen him for a year and a half.

"Q. But at that time, that was your opinion? A. Yes. He had just—his infection, as I remember, had been cleared up only some three or four months, and I had it in mind using his foot at that time, in all probability, might flare his infection up."

Obviously, the above related testimony of the physicians who had an opportunity to, and did, diagnose the injured party's condition, tends to corroborate the insured as to his disability; and the jury having found in line with the testimony that the insured was totally and permanently incapacitated to perform a substantial part of any work or employment which he was able to perform before such injury, and such finding having been approved by the trial court, appellate courts are powerless to disturb such findings.

■■■ The insured being totally and permanently disabled to perform a substantial part of any work, or employment which he was able to perform, without further training, as demonstrated in the original opinion, we think the trial court was not required to submit an issue of partial disability. The issue of partial disability is the

antithesis of permanent disability, the same as any other defense to an alleged breach of contract. Plaintiff's suit is based on total permanent disability, within the purview of the contract of insurance, thus, partial disability was a complete defense to the suit, to the same effect as the defense of general denial. The issue of partial disability merely contradicts plaintiff's cause of action on the question of total disability. Indeed, in suits arising under the Workman's Compensation Law, or upon contracts where partial disability appears as an element of recovery or defense, affirmative submission of partial disability is proper. This is demonstrated in cases cited in appellant's motion for rehearing. In E. K. Local Ins. Co. No. 1 of Seymour v. Lilly, Tex.Civ.App., 1 S.W.2d 490, "total permanent disability or death", within the terms of the contract of insurance sued on, was an issue in one bracket of recovery, and "permanent partial disability benefit" was an issue in another bracket. In that case, the court correctly submitted both issues to the jury for their determination. The issue on partial disability there submitted, and the one here requested and refused by the trial court, is to the tenor following:

"Now comes the defendant, at the conclusion of all the evidence, prior to the submission of this cause to the jury, prior to the giving of any charge to the jury, and subject to its motion for a peremptory instruction, and in the event only that it should be overruled, and prays the court to submit to the jury its Special Requested Charge No. 8, reading as follows:

"Special Issue No. ———

"Do you find from a preponderance of the evidence that the plaintiff, Donald J. Curfman, has become permanently partially disabled by reason of the injury to his right foot?

"In this connection I instruct you that if you believe from a preponderance of the evidence that the plaintiff, as a direct result of the injury complained of by him, has sustained a partial physical inability to perform such labor as he was engaged in at the time of his injury, or any similar or other work open and available to him and that he will not recover from such physical incapacity or inability, you will answer Special Issue No. ——— in the affirmative, but unless you so find and believe from a preponderance of the evidence you will answer said issue in the negative. Answer Yes or No. Answer ———."

As demonstrated above, the court was not required to submit the same issue in different forms. The jury having found that the insured's injuries totally and permanently disabled him, the only issue on which his action depended, the court did not err in refusing to affirmatively submit the issue of partial disability, as requested; appellant's motion for rehearing is overruled.